Argued January 24, reversed and remanded March 28, rehearing
denied May 16, costs entered May 16, 1922.

## BACKUS *v.* WEST ET AL.

(205 Pac. 533.)

**Landlord and Tenant—Provision for Payment of Rent on or Be-
fore Tenth Day of Month Refers to Rent of Month in Which
Payment Made.**

1. A lease requiring the monthly rent to be paid on or before
the tenth day of each month meant that the rent should be paid
on or before the tenth day of the month to which the payment
was applicable, and not that the rent of the following month or
preceding month should be so paid.

**Landlord and Tenant—Lease Authorizing Landlord to Retake Pos-
session on Default was Valid.**

2. A lease making time the essence of the agreement and pro-
viding that in case of default in paying monthly rentals the land-
lord might re-enter, retake possession of the land and personal
property, remove all persons therefrom, and terminate the lease,
though a hard contract, was valid.

**Landlord and Tenant—Tender of Rent by Subtenant Declined by
Landlord Held an Insufficient Tender.**

3. There is neither privity of estate nor of contract between a
lessor and a subtenant of the lessee, and the subtenant could not
compel the lessor to accept rent from her, and her tender of rent
to the lessor was insufficient as a tender of the rent.

**Landlord and Tenant—Tender of Check Marked to Apply on De-
cember Rent Held not Sufficient Tender of November Rent.**

4. Under a lease making the rent for each month payable on
or before the tenth day of the month, it was competent for lessee
to tender the December rent on November 11th, and the offer on
that day of a check stating on its face that it was to apply
on the December rent was not a good tender of the November
rent, especially as it was too late and was made payable to the
tenant in trust for the landlords and not indorsed by anyone.

104 Or.—9

**Landlord and Tenant—Landlord Re-entering Held not to have Converted Tenant's Property by Forbidding Trespass.**

5. A landlord who re-entered rightfully and took possession of the property for default in the rent *held* not to have converted the household goods and wearing apparel by posting a notice forbidding trespasses by the tenant or his representatives, as the tenant would not have committed a trespass by going on the premises without a breach of the peace only to move his property without unnecessary delay or damage.

**Landlord and Tenant—Landlord Re-entering Held not to have Converted Personal Property by Warning Tenant not to Go on Premises.**

6. A landlord who had the right to and did re-enter and take possession for default in the payment of rent *held* not to have converted the tenant's household goods and wearing apparel by telling the tenant that he could not come on the premises or set foot thereon without an officer of the law.

**Landlord and Tenant—Right to Re-enter and Remove All Persons Includes Right to Remove Goods.**

7. A landlord's right under a lease to re-enter and take possession, terminate the lease, and expel and remove all persons from the premises in case of default in the payment of rent necessarily includes the right to remove the goods of such persons, and such removal is not a conversion if done with reasonable dispatch.

**Landlord and Tenant—Temporary Interference With Tenant's Possession of Personal Property Held Necessary Incident of Right to Resume Possession.**

8. Where a landlord was entitled to and did re-enter and take possession on default in the payment of rent his keeping the tenant temporarily out of the possession of household goods and wearing apparel *held* a necessary incident of his right to resume possession.

**Trover and Conversion—Judgment Transfers Title.**

9. The effect of a judgment in trover and satisfaction thereof is to transfer to the defendant as of the date of the conversion the title to the property converted.

**Trover and Conversion — Evidence of Mistreatment of Property After Conversion Immaterial.**

10. Since satisfaction of a judgment in trover transfers title to defendant, evidence of maltreatment of the property by defendant or those acting for him after the conversion is inadmissible.

**Evidence—Receipts Hearsay and Inadmissible Between Third Persons to Show Amounts Paid.**

11. Receipts from dealers for payments for furniture were hearsay and inadmissible between third persons to show the amounts paid for the furniture.

**Landlord and Tenant—Landlord Re-entering Held not to have Converted Cattle Where He Did not Deny Defendant's Title.**

12. A landlord who had the right to and did re-enter and take possession for default in the payment of rent did not convert the

defendant's cattle where he never claimed title to them or did any act inconsistent with plaintiff's title.

**Trover and Conversion—Measure of Damages Stated.**

13.   The true measure of damages for the conversion of personal property is its reasonable market value at the time and place of conversion.

**Trover and Conversion—Evidence of Value at Time Other Than Conversion of Doubtful Admissibility.**

14.   In an action for the conversion of personal property, the admission of remote transactions respecting the value of the property at some former time is of doubtful propriety, and not to be encouraged, especially where the property has a known market value at the time of the conversion.

From Multnomah:   J. P. KAVANAUGH, Judge.

Department 1.

REVERSED AND REMANDED.   REHEARING DENIED.

For appellants there was a brief over the name of *Mr. Ralph R. Duniway,* with an oral argument by *Mr. C. L. Whealdon.*

For respondent there was a brief and oral argument by *Mr. Jay Bowerman.*

BURNETT, C. J.—This is an action for the conversion of personal property. The genesis of the transaction out of which this dispute arises was a lease dated June 30, 1916, from the defendants to the plaintiff and his brother, the latter of whom without dispute assigned his share of the lease to the plaintiff. The lease included about 852 acres of land in Columbia County, together with cattle, horses, hogs and farming implements thereon, the place being a well-stocked dairy farm.

Concerning the rent, the contract contained this provision:

"That the said parties of the second part will pay the parties of the first part, during the first year of

said term, a monthly rental of three hundred dollars ($300) per month, payable in cash on or before the tenth day of each and every month, and the sum of three hundred thirty-five dollars ($335) per month for the remaining four years of said term, to be paid on or before the tenth day of each and every month as the same shall become due."

As to replacement of stock and the like, there was this stipulation:

"The parties of the second part agree as part of the consideration of this lease to leave on the premises above described, upon the vacancy of the premises at the termination of this lease, substantially the same amount and kind of crops growing thereon as now received from the lessor, said crops consisting of forty acres of oats, five acres of wheat, forty acres of oats and vetch, thirty acres of corn and two acres of potatoes, and of the personal property above described, the parties of the second part agree that upon the termination of this lease, they will surrender to the parties of the first part, the same number, kind and quality of cattle, calves, horses, poultry, farming implements, etc., as those received from the lessors as above described—or in lieu thereof, property of equal value, agreeable to and to the satisfaction of the parties of the first part."

The instrument concluded with this defeasance clause:

"It is mutually agreed that time is of the essence of this agreement, and that should default be made in any of the covenants or agreements herein contained on the part of the parties of the second part, or should default be made in the payment of each, either, or all of the monthly payments, as above specified, as and when the same shall become due and payable, it shall be lawful for the parties of the first part or their duly authorized agents to re-enter the premises described, retake possession thereof, including the personal property described, and remove all persons from said premises and to terminate this lease."

The plaintiff claims that he was residing with his wife in the dwelling-house on the premises and that on or about November 16, 1916, the defendants broke into the building and ''took from the possession of the plaintiff and into their own possession, and converted into their own use the following described goods and chattels, then and there the personal property of this plaintiff and his wife.'' The complaint then describes under that count a lot of household furniture, wearing apparel and household supplies. There are also involved the livestock and implements included in the lease, and the crops grown on the place and harvested during the four and one-half months the plaintiff was in possession. It is said further that the plaintiff's wife transferred to the plaintiff all her chose in action respecting the property and its conversion.

The complaint is traversed by the answer *in toto* except as to the statement that the plaintiff and his wife were living in the dwelling-house on the premises about November 16, 1916. Affirmatively, the defendants recite the giving of the lease and charge that the lessees violated the terms thereof in several particulars, among others that they did not pay the rent as required by the lease, setting out the facts as they claim; that thereupon the defendants re-entered the premises, took possession of them and notified the plaintiff to remove his personal property therefrom; that he took away part and left the remainder, whereupon the defendants notified the plaintiff that unless he removed the said residue of his property from the premises the defendants would cause the same to be removed and stored at his expense and risk, in consequence of which, owing to the failure of the plaintiff to

remove his goods, the defendant stored them in the nearest public warehouse, the same being in Portland, Oregon, and notified the plaintiff thereof; that thereafter he removed part or all of his property from the warehouse; and that the defendants have no charge or control over it.

Replying, the plaintiff admits the lease, but challenges the answer in important particulars, saying that on July 1, 1916, the plaintiff with his brother, cotenant, took possession of the property and that thereafter on November 8, 1916, the plaintiff sublet the premises and personal property until December 1, 1920, to one Nellie K. Smith, with the understanding and agreement, however, that the plaintiff was to remain and continue in charge thereof on a salary as the superintendent for said Nellie K. Smith; and that as such superintendent he continued in possession of the properties until November 16, 1916, when he was dispossessed as in the amended complaint alleged.

On the issues thus formed a trial was had and a verdict rendered against the defendants assessing damages in the sum of $5,500. The verdict reads thus:

"We, the jury, impaneled and sworn to try the above-entitled cause, find our verdict for the plaintiff and against the defendants, and we assess the plaintiff's damages and find our verdict in his favor in the sum of $5,500, as follows:

| | |
|---|---|
| Household goods, personal effects and property of that kind removed and stored in warehouse | $3,100.00 |
| Hay, grain, feed, ensilage, potatoes and apples | 2,000.00 |
| Livestock | 400.00 |
| | $5,500.00" |

It appears from evidence that considerable friction arose between the parties early in the tenancy and that on November 16th, while the plaintiff and his wife were absent from the premises the defendants re-entered, resumed possession, took the plaintiff's household furniture out of the house, in large part at least, storing it in the woodshed and on the porches of the house. When the plaintiff and his wife returned in the evening, they were forbidden by the defendants to enter. A few days later, the plaintiff and his wife returned to the premises and demanded permission to go in and get some wearing apparel. The defendant Burt West said to them, according to the testimony of the plaintiff: "You can't set foot on these premises or come on these premises without an officer of the law." Meanwhile the defendants had posted on the gate at the entrance of the premises a trespass notice in this language:

"No trespassing by J. E. Backus, family, agent or representative allowed on these premises. Violators will be prosecuted to the full extent of the law": Signed by the defendants.

Without further effort to gain possession of the property the plaintiff went away. A few days afterwards, the defendant Burt West notified him to the effect that unless he came and took away his property it would be stored at the plaintiff's expense. As the plaintiff did not come for the property, the defendants had it removed and stored in a public warehouse in Portland, that being the nearest place of the kind. This action was begun for the conversion not only of the household goods, wearing apparel and family supplies, but also of the personal property included in the lease, together with five

head of cows which the plaintiff claims were his property.

It is important to examine the undisputed testimony as to the performance of the terms of the lease. It is averred in the reply that the plaintiff had sublet the premises to Nellie K. Smith and the contract of leasing of date November 8, 1916, from the plaintiff to her, appears on the record, covering "all of the land and personal property leased by Burt West and Mrs. Burt (Hazel M.) West in a certain lease to J. E. Backus and W. E. Backus dated the thirtieth day of June, 1916," from November 1, 1916, to December 1, 1920. Nellie K. Smith covenanted with the plaintiff here to perform all of the conditions which he was bound to perform in the lease between himself and these defendants, and she also promised to pay the defendants the same rent specified in the original lease. Under these circumstances, on November 8th, by a letter signed "Mrs. Frank L. Smith" she wrote to the defendants at Scappoose, Oregon, in this tenor:

"I beg to inform you that I have taken over for a term of years the lease of the real estate and personal stock which you made with Mr. J. E. Backus and Mr. W. E. Backus. I herewith hand you a check for $300 for rent from November 1st, 1916, to December 1st, 1916. Kindly send me a receipt for the rent."

The check mentioned was one of Frank L. Smith payable to the order of the defendants in the sum of $300, addressed to S. M. Mann & Company, bankers. On November 9, 1916, the defendants wrote thus to Mrs. Frank L. Smith, inclosing the $300 check already mentioned:

"We acknowledge receipt of your letter of November 8, 1916, with your personal check for $300,

in which you state that you have taken over our lease with Mr. Backus covering our land and cattle.

"This is to notify you that we do not consent to such attempted consignment and return your check herewith, and you are denied any rights under such assignment or lease to Mr. Backus and are forbidden the right to take possession of any of the property mentioned."

Following this on November 10th, Nellie K. Smith signed and sent to the defendants this letter:

"Your letter of November 9, 1916, refusing my check received. If you do not care to deal with me, of course, I will pay the money to Mr. Backus and Mr. Backus can pay his rent to you."

On November 11th, the plaintiff provided himself with a check of Frank L. Smith reading thus:

"November 11, 1916.

"S. H. Mann & Company, Bankers.

"Pay to W. E. Backus in trust for Burt and Hazel M. West $300. Three Hundred Dollars.

"(Signed)     FRANK L. SMITH.

"(Rent West Place 852 acres Dec. 1, 1916, to Dec. 31, 1916, and personal stock thereon.)"

On that date, as he says, he "took it down and handed it to Mrs. West, telling her it was the rent money, and she said: 'Nothing doing. You are too late now; we are going to have the place.'" This check was certified by the cashier of the bank to which it was addressed, but was refused by the defendants and returned to the plaintiff.

1. It is material to determine the rights of the parties growing out of these admitted transactions in respect to the authority of the defendants to re-enter and take possession of the premises. The stipulation respecting the payment of rent says that the tenant "will pay the parties of the first part during the first year of said term a monthly rental of $300 per month, payable in cash on or be-

fore the tenth day of each and every month." ' The plain meaning of this language is, that the rent must be paid on or before the tenth day of the month to which it is applicable. It cannot mean that it is to be paid on the tenth of the preceding month necessarily, or at all on the tenth of the succeeding month. For illustration, the rent for any November must be paid on or before the tenth day of that November. Respecting the payment of rent, Section 2548, Or. L., reads thus:

"Unless otherwise expressly provided by the lease or terms of holding, all rents reserved shall under this act be due and payable in advance, and the tenant shall pay or tender payment thereof on or prior to the first day of the rent paying period as in his lease, or by the terms of his holding, may be provided, and no demand therefor shall be necessary to render a tenant in default."

In this instance the rent paying period is one month, and if nothing else appeared in the lease on that subject, the law would require payment on the first day of each month. The provision here, however, that it must be paid on or before the tenth day of the month varies the statutory rule to that extent but no farther.

2. The defeasance clause at the end of the lease is equally explicit, that time is the essence of the agreement and that should default be made in the payment of any of the monthly rentals as and when they shall become due and payable, it will be lawful for the landlord to re-enter the premises, re-take possession thereof together with the personal property described, remove all persons from the premises and terminate the lease. Perhaps it is a hard contract, but the parties had a right to make it in the very terms mentioned, and as there is no fraud charged

or other attack made upon its integrity, it must stand as stated and serve as the standard which the parties themselves have erected to govern their relations with each other.

3. We next consider the effect of the tender by Mrs. Smith of the check of her husband dated November 8, 1916. It has been stated several times in decisions in this jurisdiction that between the lessor and the under tenant of the original lessee there is neither privity of estate nor privity of contract: *Holman* v. *De Lin,* 30 Or. 428 (47 Pac. 708); *Moline* v. *Portland Brewing Co.,* 73 Or. 532, 537 (144 Pac. 572). The same doctrine is enunciated in *Williams* v. *Michigan Central Ry. Co.,* 133 Mich. 448 (95 N. W. 708, 103 Am. St. Rep. 458), where a long list of precedents is cited in support. In *McDonald* v. *May,* 96 Mo. App. 236 (69 S. W. 1059), it is taught that a lessor who accepts a surrender of a lease cannot recover from a subtenant unless the latter attorns to him. In *Wray-Austin Machinery Co.* v. *Flower,* 140 Mich. 452 (103 N. W. 873), it was held that there is no privity between the owner and a subtenant and that the latter is a stranger to an action by the former against the original tenant to recover the leased premises. The deduction from this principle is, that in the absence of the consent of the defendants here Mrs. Smith, being a subtenant under the lease between herself and the plaintiff, appearing in evidence, assumed no relation whatever with the defendants. She could not compel them to accept from her any rent. Her efforts in that respect were vain and without dispute were flatly declined by the defendants. She herself, according to her letter in reply to their return of the check, adopts that view of the case, saying that she would pay her

rent to her immediate landlord and that he could pay to the defendants.

There are cases which on superficial examination might indicate to some that a subtenant has a right to compel the original landlord to accept from him the rental he agreed to pay to the original lessee. For instance, there is the case of *Thompson* v. *Commercial Guano Co.,* 93 Ga. 282 (20 S. E. 309). There, the original landlord had a lien on all crops grown on the land including that of the subtenant, for the payment of the rent. The subtenant had given his non-negotiable note to his immediate landlord, covering the installments of rent to be paid thereafter. This note was transferred to someone who had knowledge of all the facts. The subtenant had paid to the head landlord the rent due from him to the original lessee, and the head landlord had accepted it. Afterwards the holder of the note began an action on it against the subtenant, the latter of whom successfully defended the action on the ground that he had already paid the rent it represented. *Peck* v. *Ingersoll,* 7 N. Y. 528, a case often quoted, is one in which the head landlord had the right to re-enter for default in payment of the rent. The subtenant paid to him the rent due to the first lessee and successfully resisted an action by the latter for the same rent. In *Kedney* v. *Rohrbach,* 14 Daly (N. Y.), 54, a tenant having sublet part of the premises sold the lease to another, whom the landlord accepted as his tenant. This was held to be a surrender of the lease and to protect the subtenant from an attempt of his former landlord to collect the rent. Moreover, the consent of the first lessor was embodied in his acceptance of the subtenant as his own lessee. *Raubitscheck* v. *Semken,* 4 Abb. N. C. (N. Y.) 205, note,

states a case in which a subtenant whose immediate landlord is in default of payment of rent under a lease where the head landlord has a right of re-entry and dispossession, may pay the rent to the latter and thus protect himself against his immediate landlord. Cases of that sort may be multiplied *ad libitum,* but they all portray situations where the original landlord, of his own volition, accepts rent from the subtenant, with the result that question about it arises between the original tenant and his lessee who has discharged *pro tanto* the obligation of him to whom he owed immediate duty.

A distinction properly may be drawn between a case of subtenancy and one where the original tenant assigns to another the whole of his estate under the lease. The owner of the fee may create an estate for years in the land by a lease to his tenant, reserving a rent. The tenant, being thus the owner of an estate in land, may of right, unless restrained by the terms of the lease, convey that estate entirely to another, who thus becomes the assignee of the lease, assuming all its obligations, including the payment of the rent. By virtue of the transfer of this entire identical estate originally created by the owner of the fee, there springs up by operation of law a privity of estate between the original landlord and the subtenant, that is to say, they are both concerned in the same estate, the one as its creator and the other as its assignee. This is not true, however, where the original tenant creates a new and different estate, although one for years, and confers it as a lessor upon a subtenant. No privity of estate arises under such circumstances, between the owner in fee and the subtenant. It is not an estate to the creation of which the owner in fee has been a party. The con-

tract by which the subtenancy was created was a
transaction to which he was a stranger and in which
he cannot be compelled by a subtenant to participate.
To hold otherwise would be to overturn the well-
recognized principle that between a subtenant and
the head landlord there is neither privity of es-
tate nor of contract. In the present instance, if the
defendants had accepted rent from Mrs. Smith in
the form of the check of her husband, it would have
had the effect of protecting Mrs. Smith, the subtenant,
from a subsequent effort of the plaintiff here to
collect the same rent. As a satisfaction of the rent
payable to the defendants under the original lease,
it would depend upon their consent to accept it from
the subtenant. Stating it differently, by virtue of
the contract between her and her immediate landlord,
the plaintiff here, she became liable to her immediate
landlord to pay the rent. If, then, the defendants
consented to and did accept the rent from her,
she would have paid his obligation growing out
of the original lease, which would protect her as
against him. This, however, is predicated upon the
essential condition that the head landlord would
accept her proffer in payment. But as she had no
contractual relation with the defendants and there
was no privity of estate between her and the de-
fendants, she had no ground whatever, in the ab-
sence of their consent, to compel them to deal with
her. It is true that under such cases as *Baker* v.
*Eglin,* 11 Or. 333 (8 Pac. 280), one for whose benefit
a promise to a third party is made, may enforce it
by action in his own name. But this involves the
consent of the beneficiary, which he manifests by
instituting the action. In brief, one cannot be com-
pelled to deal with another where there is no privity

of contract or of estate between them. Again, there are cases, such as *Forderer* v. *Schmidt,* 154 Fed. 475 (12 Ann. Cas. 80, 84 C. C. A. 426), holding that a valid tender may be made by a stranger in behalf of one from whom a payment is due, provided that the latter adopts the action of the one presuming to represent him; and this doctrine is supported by the weight of authority. Such cases do not apply where the one making the tender is acting for himself and not for the one owing the money, nor where the latter fails to ratify the offer to pay. In the instant case Mrs. Smith was avowedly acting in her own behalf and not for Backus when she sent her husband's check to the defendants. Moreover, the plaintiff did not ratify her tender, but took up the matter on his own account, taking a different check which he personally tendered to the defendants and which they declined.

4. We next come to the effect of the transaction of November 11th. We recall that, as shown by the record, the October rent had been paid. That next due was the rent for November, which, as we have seen by the lease itself, was payable on the tenth day of that month, time being of the essence of the contract. We note by the specification on the face of the certified check that it was to apply on the rent for the month of December, 1916, and not for November. The check was payable to ''W. E. Backus in trust for Burt and Hazel M. West.'' But it was not indorsed by anyone and in that condition could not have been used commercially by the defendants. It is common learning that anyone making payment of money has a right to apply it to any one of several installments that are payable. It was competent for Backus to tender the rent of December, for the lease

prescribes that the payment may be made on or before the tenth of the month. But the offer to pay and the application thereof to the December rent did not constitute a payment or tender of the November rent. Moreover, it came too late by one day, for his check was offered, according to the testimony of the plaintiff himself, on November 11th, whereas the November rent was due the day before. By the plain terms of the defeasance clause this gave the defendants the right to re-enter and take possession of the property and to maintain that possession.

5. At least as to the household goods and wearing apparel, there is no evidence tending to show that the defendants ever denied the title of the plaintiff, or did any act indicating that they purposed to appropriate the goods to their own use. On the contrary, everything appearing in the evidence is to the effect that they were anxious to rid themselves of Backus and all that was his. Under the admitted circumstances of the case, the posting of the trespass notice did not have a contrary effect. All that warning forbade was trespassing, and if without a breach of the peace Backus went upon the premises for the sole purpose of moving his goods, and took them away without unnecessary delay or damage to the property of the defendants, it would not constitute trespassing. The statement that, "You can't set foot on these premises or come on these premises without an officer of the law," does not constitute a conversion of the goods that the plaintiff may have had on the land.

6-7. As we have seen the defendants had a right to re-enter and take possession of the land for default in payment of the rent, and to terminate the

lease and expel or remove all persons from the premises. The defendants therefore had a right to maintain that possession. They had done only what the parties agreed they had a right to do; and at least the maintenance of that contractual right cannot amount to a conversion of what goods of the plaintiff happened to be on the land. With the stipulated right to remove all persons from the premises was necessarily included the right to remove their goods, which does not involve conversion of them, if done with reasonable dispatch. The well-considered opinion of Mr. Justice BEAN in *Lee Tung* v. *Burkhart,* 59 Or. 194 (116 Pac. 1066), presents a parallel case and is conclusive of the issue here: See, also, *Hart* v. *Oregon Laundry Co.,* 91 Or. 324 (178 Pac. 932).

8. Another view is, that keeping the plaintiff out of the possession of his goods temporarily was a necessary incident of the undoubted right of the defendants to resume and maintain possession of the land. An analogous case is *McKeesport Sawmill Co.* v. *Pennsylvania Co.,* 122 Fed. 184, in which the court held that the defendant was not liable in trover when it was obliged to break up and destroy the plaintiff's barge which had lodged against the false work of a bridge being constructed by the defendant and threatened the destruction of the bridge. The breaking up of the barge was an incident of the right of the defendant to maintain the bridge. So here, keeping the plaintiff away from his chattels on the land was incidental to the right of the defendants to maintain possession of the realty.

9. Over the objection and exception of the defendants, the plaintiff went to great lengths in describing what happened to the household goods after the defendants had taken possession of the property,

104 Or.—10

posted the trespass notice and warned the plaintiff that he could not come upon the premises without an officer. If there was a conversion, it was complete at that time. The effect of a judgment in trover and the satisfaction thereof is to transfer to the defendant as of the date of the conversion the title to the property converted: 38 Cyc. 2112. As said in *Hepburn* v. *Sewell,* 5 Har. & J. (Md.) 211 (9 Am. Dec. 512):

"It must be borne in mind that the plaintiff in an action in trover compels the defendant to become a purchaser against his will. * * He selects the date of the conversion as the epoch of the defendant's responsibility, and claims from him the value of the property at that period, with interest, to the time of taking the verdict. The inchoate right of the defendant as a purchaser must, therefore, be considered as coeval with the period of conversion, and his right being consummated by the judgment and its discharge, must, on equal and equitable principles, relate back to its commencement."

Also in *Bates* v. *Stansell,* 19 Mich. 91, it is said that a subsequent rise in value cannot be allowed to enhance the damages in trover. The same doctrine is taught in *Eldridge* v. *Hoefer,* 45 Or. 239 (77 Pac. 874).

10. All evidence of maltreatment of the goods by the defendants or those acting for them after the conversion was therefore immaterial and calculated to prejudice the minds of the jury against the defendants, for in principle as affected by the result of an action in trover, they were damaging their own property, which does not concern the plaintiff.

11. In their discourse from the witness-stand and about the household furniture involved, the plaintiff and his wife produced receipts from some Spo-

kane dealers in furniture, dated several years before the trial, showing payment to the firm by the plaintiff at various times. It was objected that they were hearsay, that there was nothing to indicate for what furniture the payments had been made, and that they were irrelevant. It has been held in *Caro* v. *Wollenberg,* 83 Or. 311, 323 (163 Pac. 94), that the receipts of third parties for money payments are hearsay and consequently not admissible. They are the unsworn declarations of the party executing the receipts, the signer is not subject to cross-examination and they have no binding force whatever between strangers to the instrument.

As to the household furniture and the personal property included in the original lease, there is no basis in the testimony upon which to found conversion, however much as to the furniture there may be evidence of damage consequent upon a trespass thereon. As to this last, we make no intimation, confining ourselves to the statement that as to those articles conversion is not proved.

12. There may be some ground to claim conversion of the hay, ensilage and other forage on the premises, for it is in evidence that the defendants fed it to the stock. As to the cattle, five cows which the plaintiff claims were converted, there is no sufficient evidence of conversion. It is true that they were on the place like other property claimed by the plaintiff, at the time the defendants took possession, but otherwise they stand in not so favorable a light as to conversion as the furniture, even. There is no evidence in the case of the plaintiff that the defendants claimed title to them or did any act towards them inconsistent with the title of the plaintiff.

13. It is said by some authorities that what one paid for property is some evidence of its value. Another view is that it is not competent evidence, especially where the purchase price was paid several years before the transaction in question.

14. The true measure of damages is the reasonable market value of the goods converted, at the time and place of conversion. The admission of remote transactions respecting the value of the property at some former time is of doubtful propriety and is not to be encouraged, especially where the goods have a known worth in the market at the time of the alleged conversion. The case presented by the plaintiff is dangerously near the peril of nonsuit, even as to the hay and other like property.

There is manifest error in the reception of evidence, as indicated, and the result on the whole case is that the judgment of the Circuit Court is reversed and the cause remanded for further proceedings.

REVERSED AND REMANDED. REHEARING DENIED.

McBRIDE, HARRIS and RAND, JJ., concur.