Argued December 22, 1937; reversed February 1, 1938

CONLEY *v.* HENDERSON ET AL.

(75 P. (2d) 746)

In Banc.

*S. J. Bischoff*, of Portland (Bischoff & Bischoff, of Portland, on the brief), for appellant.

*Nicholas Jaureguy*, of Portland (Jaureguy & Tooze, of Portland, on the brief), for respondents S. E. and Dorothy K. Henderson and Harry J. DeFrancq.

RAND, J. The plaintiff, James L. Conley, brought this suit against S. E. Henderson and others, seeking to have two deeds, absolute in form, declared to be a mortgage. In and by one of said deeds, Conley and wife had conveyed to S. E. Henderson 920 acres of tim-

berland in Douglas county, Oregon. In and by the other deed, under Conley's direction, the Wallingwood Company, a corporation the stock of which was owned by Conley, had conveyed to Henderson the west 54 feet of lot 10, block 271, Couch Addition to the city of Portland, together with an apartment house thereon known as the Teshner Manor. Both of said conveyances were made on the same day and as a part of the same transaction.

The plaintiff in his complaint alleged that these conveyances were intended as security for the payment of a debt. This was denied by the defendant Henderson in his answer and it was therein alleged that these conveyances were intended to be absolute sales of the two properties with merely a contract of repurchase, which contract the plaintiff had failed to fulfill within the time specified and, therefore, upon the expiration of such period, all of plaintiff's rights had ceased and determined.

These allegations of the answer having been put in issue by the reply, the cause proceeded to trial and resulted in a decree in favor of the defendants, from which the plaintiff has appealed.

It appears from the evidence that shortly prior to the conveyances of these properties to Henderson, Conley had entered into a contract with one C. L. Teshner, wherein it was agreed that Conley should purchase and Teshner should sell the apartment house property subject to an outstanding mortgage for $23,800 and that Conley should pay Teshner therefor the sum of $5,550 in money and convey to him a tract of approximately 22 acres of land in Clackamas county. Conley, however, was unable to make this payment from his own moneys within the time specified in the contract and obtained from Henderson the sum of $5,500 and used

said sum of money together with $50 of his own to purchase the apartment house property. In addition thereto, he conveyed to Teshner the 22 acres of land in Clackamas county and Teshner, at Conley's request, deeded the apartment house property to the Wallingwood Company and the Wallingwood Company, in turn, conveyed the same to Henderson on Conley's direction and thereby the contract between Conley and Teshner was completely performed. As to these facts there was no dispute in the evidence.

It is also undisputed that, in obtaining this money from Henderson, Conley's agent applied to Henderson for a loan of $5,500 for 60 days and offered a bonus to Henderson of $1,000 for making the loan and, to secure the payment thereof, offered to give Henderson a second mortgage on the apartment house property and a first mortgage on the 920 acres of timberland which later Conley conveyed to Henderson, and that Henderson refused to make the loan on those terms.

The evidence further shows that the negotiations with Henderson were not terminated by said refusal but continued up to and including the time when Conley's contract with Teshner was completely performed and the apartment house had been conveyed to the Wallingwood Company and, by it, to Henderson as above stated.

It appears from the evidence that, when Conley ascertained that he would have to borrow the $5,500 to pay for the apartment house property, he employed Wendell S. Poulsen to obtain the loan for him and Poulsen, not being able to do so, employed one J. C. Wagner to borrow the money from Henderson and, after Henderson's refusal to make the loan, Wagner proposed to Henderson that he should take a deed from Conley for the 920 acres of timberland and also for the apart-

ment house property and advance the $5,500 necessary for the purchase of the apartment house property, not by way of a loan but as an absolute sale to Henderson, and give Conley merely an option to repurchase the property from Henderson for the sum of $6,500, and Henderson testified that it was with that understanding he purchased the properties and gave to Conley a contract of repurchase.

The evidence shows that Wagner's proposal to Henderson, if it was ever made, was wholly unauthorized and that Conley never had any notice thereof or consented to or ratified such a course of dealings on Henderson's part. On the contrary the evidence shows that Conley was merely informed that Henderson would advance the money only upon a conveyance of the properties to him and the giving by him of a four months' contract for its repurchase by Conley, and, upon these terms, Conley, after being assured by McMullen, one of Henderson's agents, that Henderson was financially responsible, accepted the money and consented to the conveyance of the properties to Henderson with a contract of repurchase by him on or before four months from the time the money was furnished.

It also appears from the testimony that, after Conley had agreed to the conveyance of the properties to Henderson and to take a contract of repurchase, Henderson turned the matter over to his lawyer, Harry J. DeFrancq, to arrange the details and to prepare the papers, and DeFrancq testified that, because the dealings between Conley and Henderson had originated in an application for a loan, in order to prevent Conley from ever claiming an interest in the property and to prevent litigation, the transaction should be split in two parts and that the contract of repurchase should not be made on the day the deeds were delivered, nor

directly by Henderson to Conley, but should be made to a third party and, by him, be assigned to Conley at a later date.

The evidence further shows that, before turning the matter over to DeFrancq, Henderson inquired of Poulsen whether Conley was the kind of a man who would agree to pay a bonus and then sue for its recovery and had been assured that Conley was not that kind of a man.

It further appears from the evidence that all the above conveyances, together with Henderson's check for $5,500, were placed in escrow in the United States National Bank of Portland, under certain escrow instructions in writing signed by Teshner and Conley on the one hand and by Conley and Henderson on the other, and, with the exception of the contract of repurchase, were all delivered on November 5, 1935, to the various parties respectively.

It further appears that all said parties met at the bank on said date and that Conley had been informed and believed that on that day the contract of repurchase would be delivered to him. But, because of DeFrancq's fear of further litigation, an unsigned copy of a contract of repurchase from Henderson, which had been prepared and not signed but deposited in escrow, was, at Conley's request, delivered to him and Conley was assured by DeFrancq that he would get the contract of repurchase signed at a later date, naming him as the party, and would assign it to Conley, and, with that understanding, Conley consented to the delivery of the deeds.

The evidence further shows that a few days later the contract of repurchase was prepared and signed by Henderson and about a week later it was assigned by

DeFrancq and delivered to Conley. That contract referred to both of said properties and, in part, reads as follows:

"It is agreed that the option shall be exercised for said properties jointly and that Harry J. DeFrancq and assigns, shall not have the right to exercise this option as to one of the properties only. The purchase price shall be the sum of $6500.00, with interest thereon at the rate of 7% per annum from the date hereof, plus any payments upon the principal or interest of the mortgage then upon said properties made by S. E. Henderson subsequent to the date hereof. In the event such option is exercised, however, the said Harry J. DeFrancq and assigns shall be credited on such purchase price with the income of said properties, if any, actually collected from the date hereof to the time said option is exercised, after deducting therefrom expenses of operation of said properties, including 5% of the gross receipts as a management fee."

It also appears from the testimony that Conley, in arranging with the bank for the deposit of these papers in escrow, deposited $100 with the bank and instructed the bank, upon the performance of the escrow agreements, to pay for the purchase of revenue stamps to be affixed to the deeds and to pay for the recording of the deeds so placed in escrow and also to pay Teshner the $50 over and above the amount advanced by Henderson in fulfillment of Conley's contract with Teshner, the balance to be returned to Conley and that, under these directions, the bank purchased the stamps, affixed them to the deeds, paid for the recording of the deed from Teshner to the Wallingwood Company and the deed from that company to Henderson, and also for recording the deed from Conley to Henderson for the timberland, and paid the $50 to Teshner in addition to the $5,500 advanced by Henderson.

It also appears that the escrow agreement signed by Conley and Henderson, in part, provided as follows:

"Upon receipt from S. E. Henderson within 15 days from the date hereof of notice that the title to said properties is satisfactory to the said S. E. Henderson, you will deliver to S. E. Henderson, the deeds and bill of sale hereinabove mentioned and will deliver to James L. Conley the sum of $5500.00."

It also appears that Henderson, upon receiving the deed to the apartment house, took possession and management thereof and, while in possession, consulted with Conley about the discharge of the manager of the apartment house and the employment of another manager at a smaller salary, and also about payments falling due under the mortgage of $23,800 thereon, and the insurance of the apartment house.

It also appears that shortly before the expiration of the four months' period specified in the contract of repurchase, Henderson advertised the apartment house property for sale and, within a few days after the expiration of said period, without notice to Conley, sold and conveyed it to a third party in trade for other Portland properties.

The evidence further shows that the 22 acres of land which Conley conveyed to Teshner as part consideration for the apartment house was of the value of approximately $3,000 and that the timberland conveyed by Conley to Henderson had some eight million feet of merchantable timber standing thereon and that the land is favorably located for logging purposes, being situate about one mile from one of the main lines of the Southern Pacific Company, and that the timber thereon had a stumpage value far in excess of the $5,500 advanced by Henderson to Conley.

■ After a careful consideration of the testimony and of the various writings offered as exhibits in the case, we are of the opinion that these conveyances were intended as security for the payment of a debt and that the rule, once a mortgage, always a mortgage, applied to both conveyances. We will now state our reasons for so holding.

If the conveyances had been intended as an absolute sale and not as a mortgage, Henderson would have paid the full consideration of $5,550 to Teshner and not have permitted Conley to pay any part thereof, nor would he have permitted Conley to have paid for the recording of the deeds. Again, if it had been intended that Henderson should become the purchaser of the apartment house by way of an absolute sale, he would have instructed the bank to deliver the $5,500 to Teshner and not have directed the bank to pay said sum to Conley and have Conley pay it over to Teshner. If the conveyances had been intended as an absolute sale of the two properties and not as a mortgage, Henderson would not have provided in the contract of repurchase that, in the event the property was redeemed by Conley, he should be credited on such purchase price with the net income of said properties after deducting therefrom the expenses of operation of said properties including five per cent of the gross receipts as a management fee, nor would he have provided in said contract that the sum of $6,500 should bear interest at the rate of seven per cent per annum from the date thereof, as was provided in said contract of repurchase. Henderson also, if he became the absolute owner of the apartment house and Conley had no rights therein except those of a mere optionee, would have had no reason to consult with Conley about the discharge of one manager and the employment of another, nor in respect to the insurance thereon,

and certainly, having taken a deed for the apartment house subject to a mortgage of $23,800, he could have had no reason to consult Conley about the payment of any installment falling due under the mortgage, since he must have known that he would have to make these payments to protect his own title and that whatever he was compelled to pay Conley would have to repay to him if Conley exercised his contract of repurchase. Clearly, those were matters, if the sale was absolute, which could concern no one but Henderson himself.

Again, it must be remembered that the dealings between Conley and Henderson originated in an application for a loan and in an offer by Conley to pay Henderson a bonus of $1,000 for making the loan, and that, when the dealings were consummated, the payment of this bonus was made a condition in the contract of repurchase. This circumstance, when considered in connection with other testimony which shows that the negotiations between Conley and Henderson were never broken off but were carried on from time to time and, when finally consummated by making of these conveyances and a contract of repurchase, still required Conley, if he exercised his option, to pay Henderson that amount as a bonus. This circumstance alone strongly tends to show that the transaction was a loan and not an absolute sale and, when all the matters above referred to are considered and effect is given to the various writings signed by Henderson, to which we have referred, the transaction cannot reasonably be explained upon any other hypothesis than that the conveyances in question were intended as security for the payment of a debt.

As pointed out by Pomeroy, each case must involve its own special facts but he enumerates certain circumstances which are regarded by the courts as important

in determining the real intent and nature of the transaction. Two of these are as follows: liability of the grantor to pay interest and the price of the conveyance being inadequate: 3 Pom., Eq. Jurisp., sec. 1195. Here, both of these circumstances are shown to exist.

By the contract of repurchase, as already pointed out, Conley was required to pay not only the $5,500 which amount Henderson advanced but also $1,000 with interest thereon at the rate of seven per cent per annum from the date of the contract. The language of the contract is as follows: "The purchase price shall be the sum of $6500 with interest thereon at the rate of 7% per annum from the date hereof". That the price of the conveyances was inadequate is manifest. Conley paid Teshner $50 of his own money for the conveyance of the apartment house and conveyed to him 22 acres of land. He also conveyed to Henderson a valuable tract of 920 acres of timberland, paid for the recording of the two deeds to Henderson, and, if these sales were absolute, received nothing in return except a mere contract of repurchase which could be exercised only for a period of four months. Manifestly, this was not a mere inadequate consideration for these conveyances, but no consideration at all.

█ But it is contended that, because Conley is a lawyer of wide experience and has dealt extensively in the purchase and sale of other properties and knew the meaning and legal effect of the written documents which he accepted and did not insist upon a different form of defeasance, he is in no position to contend that these documents are any different from what appears upon their face and, in support therof, the defendants cite *Cater v. Simpson Estate Co.*, 103 Or. 383 (193 P. 913, 203 P. 580). In that case, however, the facts were entirely dissimilar from those involved in the instant

case. In that case, the plaintiff had given a mortgage on certain real property which had been assigned to the defendant in the suit and the defendant had sued for a foreclosure. While the suit was still pending, under an agreement between the parties, the plaintiff and defendant, the foreclosure suit was dismissed, the mortgage note was returned to the plaintiff and the mortgage was satisfied and discharged of record and the mortgage debt was extinguished and the plaintiff was given an option to repurchase the property and a lease of the premises. Under those facts, the mortgage debt being extinguished, it was properly held that, before those transactions could be challenged, fraud must be alleged and that, since there was no such allegation, the suit could not be maintained. Applied to the facts involved there, the decision was proper, but there was no necessity for alleging fraud in the instant case. As said by Pomeroy:

"* * * The general doctrine is fully established, and certainly prevails in a great majority of the states, that the grantor and his representatives are always allowed in equity to show, by parol evidence, that a deed absolute on its face was only intended to be a security for the payment of a debt, and thus to be a mortgage, although the parties deliberately and knowingly executed the instrument in its existing form, and without any allegations of fraud, mistake, or accident in its mode of execution." Id., sec. 1196.

■ It is a fundamental principle of equity that whenever a conveyance of land is given for the purpose of securing payment of an existing debt it is a mortgage. And whatever may be its form,

"If the instrument is in its essence a mortgage, the parties cannot by any stipulations, however express and positive, render it anything but a mortgage, or deprive it of the essential attributes belonging to a

mortgage in equity. The debtor or mortgagor cannot, in the inception of the instrument, as a part of or collateral to its execution, in any manner deprive himself of his equitable right to come in after a default in paying the money at the stipulated time, and to pay the debt and interest, and thereby to redeem the land from the lien and encumbrance of the mortgage; the equitable right of redemption, after a default is preserved, remains in full force, and will be protected and enforced by a court of equity, no matter what stipulations the parties may have made in the original transaction purporting to cut off this right.'' Id., sec. 1193.

In the footnote, Pomeroy says:

''This doctrine is based upon the relative situation of the debtor and the creditor; it recognizes the fact that the creditor necessarily has a power over his debtor which may be exercised inequitably; that the debtor is liable to yield to the exertion of such power; and it protects the debtor absolutely from the consequences of his inferiority, and of his own acts done through infirmity of will. The doctrine is universal in its application, and underlies many special rules of equity. It extends to stipulations limiting the time of redemption, or the parties who may redeem; notwithstanding all such stipulations, the right to redeem is general: (citing authorities).''

In section 1194, Pomeroy says:

''* * * Where land is conveyed by an absolute deed, and an instrument is given back as a part of the same transaction, not containing the condition ordinarily inserted in mortgages, but being an agreement that the grantee will reconvey the premises if the grantor shall pay a certain sum of money at or before a specified time, the two taken together may be what on their face they purport to be,—a mere sale with a contract of repurchase,—or they may constitute a mortgage. In the first case, where the transaction is merely a sale and a contract of repurchase, the agreement must be fulfilled according to its terms. If the grantor fails

to pay the money at the stipulated time, all his rights, either at law or in equity, under the contract are gone; there is no equity of redemption. In the second case, if the transaction be a mortgage, all the qualities and incidents of a mortgage attach, whatever be its external form, and whatever be the collateral stipulations. The maxim, Once a mortgage, always a mortgage, applies to this condition of fact with especial emphasis. The rights of the two parties are reciprocal: that of the grantor to redeem after a default in payment at the specified time is complete; that of the grantee to foreclose and cut off this equity of redemption is no less clear.''

As was said by Mr. Justice Story in *Flagg v. Mann,* 2 Sum. 486, 533 (Fed. Cas. No. 4,847):

''If a transaction resolves itself into a security,—whatever may be its form,—it is in equity a mortgage.''

■ To the same effect is 1 Jones, Mortg. (8th Ed.), section 294. And, as stated by Pomeroy, in section 1237, ''the form is immaterial if the intent appears to make any identified property a security for the fulfillment of an obligation.''

■ It is also contended that, because, under the federal law, federal revenue stamps are required to be placed on a deed if it is an absolute conveyance but not if it is intended as a mortgage (see 26 U. S. C., sec. 900, Note to sec. 725), the affixing of such stamps upon the deed from Conley to Henderson and upon the deed from the Wallingwood Company to Henderson shows that the deeds were intended as absolute conveyances and not as a mortgage. There is no evidence that Conley's attention was called to this particular matter. Nor is there any evidence that Conley knew of this provision of the federal statute. The stamps were affixed upon the two deeds in question by the bank and, as stated, were purchased by the bank out of money left with the

bank by Conley. The instructions given to the bank by Conley were in writing and, so far as they apply to this particular matter, they were as follows:

"The remaining $50.00 may be used by you to pay recording fees payable by me on the two above numbered escrows, pay your escrow charges on both escrows, purchase the required documentary stamps on the deeds in both escrows and whatever other expenses incident to the closing of both escrows that may require payment by me. The overplus, if any, you are to repay to the undersigned. Signed James L. Conley."

From this it will be seen that Conley never instructed the bank specifically to place stamps on either of the two deeds in question. The instructions were to "purchase the required documentary stamps on the deeds in both escrows", and it will be noted that one of said escrows contained the deed from Conley to Teshner for the 22 acres of land which was an absolute conveyance and required the affixing of revenue stamps. In the other was the deed from Teshner to the Wallingwood Company which was also an absolute conveyance and required that stamps be affixed thereon. This circumstance, therefore, has no weight.

■ It is also contended that, because certain insurance policies on the apartment house, which were issued after the Wallingwood Company deed to Henderson had been recorded, provided that the loss, if any, should be payable to Henderson, the record owner, and that Conley did not have them provide that the loss, if any, should be payable to both Henderson and Conley as their interests might appear, this is a circumstance showing that Henderson was the absolute owner of the property. We find no merit in this contention.

■ Nor do we find any merit in the contention that Conley is estopped to contend that these conveyances

were intended as security for the payment of a debt. The argument is that, since the evidence tends to show that after Henderson had refused to loan this money to Conley on the terms first proposed by Wagner, who, by the way, was not an agent of Conley's but was acting in the interest of Conley at the request of Poulsen, who was Conley's agent, that Wagner first proposed to Henderson that Henderson should himself purchase the timberland and the apartment house and merely give Conley a contract of repurchase and thereby become the absolute owner of both properties, Henderson was thereby misled into the belief that the sales were absolute and were not intended as a mortgage. As above stated, Wagner had no authority from Conley to make such a proposal or to bind Conley, if the proposal was made. Henderson, the evidence shows, was the owner of other apartment houses in the city of Portland and was engaged in the business of buying and selling apartment houses. He had built the Teshner Manor and had owned it at one time and had sold it to Teshner, after placing a mortgage thereon which had been reduced at the time of these transactions to the sum of $23,800; the amount paid by Teshner to Henderson was a sum far in excess of the amount for which Teshner had agreed to convey the property to Conley. Henderson, therefore, was dealing with property with which he was thoroughly familiar and was advised of the terms on which Conley was purchasing the property. He also was advised of every detail of the transaction he was entering into with Conley and he knew that Conley was not intending for Henderson to become the absolute owner of either of said properties but was intending the transactions to be a loan for the moneys which Henderson was advancing to him and, if anyone was misled by the form adopted in consummating these transactions, it was Conley and not Henderson.

■ Nor is Conley estopped by reason of the fact that, just before the time specified in the contract of repurchase had expired, Conley requested an extension and was informed by Henderson that Conley could exercise the contract at any time before Henderson had changed his position. The transaction being a mortgage, Conley's equity of redemption was not lost either because the time specified in the contract had expired or by his failure to pay the debt before Henderson had sold the apartment house property to another. It was lost, however, by reason of the sale being made to an innocent purchaser for value and without notice, without there having been any foreclosure of the mortgage and without the equity of redemption having been transferred by Conley to Henderson.

■ For this wrongful conversion by Henderson of the mortgaged apartment house property, the measure of damage is the value of the property so converted at the time of the conversion diminished by the amount of the mortgage which was a lien upon the property at the time Conley contracted for its purchase, plus the amount of Conley's debt to Henderson: Annotations, 46 A. L. R. 1089, 1093; *Austin v. Vanderbilt,* 48 Or. 206, 211 (85 P. 519, 6 L. R. A. (N. S.) 298, 120 Am. St. Rep. 800, 10 Ann. Cas. 1123); *Montesano Lumber Company v. Portland Iron Works,* 94 Or. 677, 687 (186 P. 428); *Bacus v. West,* 104 Or. 129, 148 (205 P. 533); *Farmer's Bank v. Ellis,* 126 Or. 602, 609 (268 P. 1009); 1 Sedgwick on Damages, 9 ed., sec. 73.

The evidence shows that the principal amount due on the mortgage at the time Henderson took a deed from the Wallingwood Company was $23,800, but the record fails to show what, if any, sum was due as interest thereon. For that reason, the cause will be remanded to the court below to determine the exact

amount due under the mortgage on the day Henderson sold and disposed of the apartment house property.

The value of that property on the day of its sale by Henderson we find from the evidence to be the sum of $35,000 and of this amount, after deducting therefrom the sum of $23,800 with interest on that amount to the date of the conversion and the further sum of $5,500 with interest thereon at the legal rate of six per cent per annum from November 5, 1935, to the date of such sale, Conley is entitled to a decree for the said difference.

The record also seems to show that the timberland conveyed by Conley to Henderson was of the value of $7,000 and that the title thereto is still in Henderson. Upon entry of the decree below, it is ordered that, if the title to said timberland is still owned by Henderson, he convey the same to Conley free from any liens and claims placed against the same by Henderson and that, if Henderson has sold and conveyed the premises, then Conley have decree against Henderson, because of such sale, for the further sum of $7,000 and that Conley have judgment both in the court below and in this court for the costs and disbursements of this suit.

The decree of the lower court will, therefore, be reversed and the cause will be remanded to the court below with instructions to enter a decree in conformity with the directions herein contained.

BELT and LUSK, JJ., not sitting.