Argued March 8, reversed and remanded April 17, 1963

MOHOFF ET UX *v.* NORTHRUP KING & CO.

380 P. 2d 983

*James P. Harrang,* Eugene, argued the cause for appellants. With him on the briefs were Arthur C. Johnson and Johnson, Johnson & Harrang, Eugene.

*Orval N. Thompson,* Albany, argued the cause for respondent. On the brief were Weatherford & Thompson, Albany.

Before McALLISTER, Chief Justice, and PERRY, O'CONNELL, DENECKE and LUSK, Justices.

O'CONNELL, J.

This is an action for damages for the alleged conversion of grass seed. Plaintiffs appeal from a judgment for defendant.

Plaintiffs are engaged in a farming operation in Linn County, Oregon. Their principal crop is rye grass seed. Plaintiffs delivered to William J. Patapoff, a seed warehouseman, a certain quantity of seed grown by them. This seed was sold by Patapoff to defendant. Plaintiffs contend that the seed was delivered to Patapoff under a contract of bailment. Defendant contends that when the seed was delivered by plaintiffs to Patapoff the agreement was such that title passed to Patapoff and that, therefore, the transaction was a sale rather than a bailment. If defendant's position is correct, Patapoff could resell the seed to defendant. The jury returned a verdict for defendant. Plaintiffs appeal from the judgment entered on the verdict.

The principal assignments of error are based upon the trial court's refusal to give various requested instructions. These instructions informed the jury in substance that the transaction between plantiffs and Patapoff would constitute a bailment if the seed was delivered pursuant to an agreement that plaintiffs had the option to demand the return of seed or the price of the seed and that Patapoff would keep on hand a quantity of seed of the same quality as that delivered sufficient to meet plaintiffs' demand if they elected to call for a return of the seed.[1]

---

[1] The following requested instruction is illustrative:

"You are further instructed that the transaction would also be a bailment and not a sale and that purchase and exercise of dominion and control over the seed by Defendant would constitute a conversion of the seed if you find that Plaintiffs could, at their option, sell the seed to Patapoff at a later date for an agreed price or at any time demand and obtain the return of the same seed or seed of like Blue Tag quality and grade and that Patapoff, under the agreement, was at all times to maintain sufficient seed on hand and in storage to cover the seed of the Plaintiffs if that particular seed was shipped out by Patapoff."

Defendant contends that there was no evidence to support such an instruction. The only evidence tending to prove that there was an agreement giving plaintiffs the option to demand seed or money is the testimony of Patapoff. His testimony was ambiguous on this point. The general tenor of his testimony was that the seed delivered by plaintiffs was not to be returned but was to be "replaced," upon plaintiffs' demand. The nature of Patapoff's obligation to "replace" seed is not made clear from his testimony. Some of his testimony quite clearly indicates that he had no obligation to keep on hand a supply of seed sufficient to meet plaintiffs' demand for the return of seed of the same quantity and quality as that delivered by them. If that were the case then no bailment would have been created.[2] Thus Patapoff testified that there were "no restrictions" on his right to dispose of the seed and that his only obligation was "to replace it with a *new* crop." (Emphasis supplied). If Patapoff's obligation to return seed to plaintiffs could be met by delivering to plaintiffs seed from a source other than the warehouse, there could be no bailment. At one point Patapoff testified as follows:

"Q Did you tell him you had other seed to replace it with?

"A I told him there was other seed in there [i.e., in the warehouse].

"Q Well, now, did you say your agreement with Mr. Mohoff was that you could ship the seed if you had seed to replace it?

"A Yes."

_____

[2] It is conceivable that a bailment could be created where the deliveree is authorized to exhaust the fungible goods on hand, it being agreed that when other goods are acquired by him the title would pass without any further acts of the parties. But it is not contended in the case at bar that this was the nature of the agreement.

If the agreement was that Patapoff could ship the seed only if *at the time of shipment* he "had seed to replace" Mohoff's seed, the transaction could then be regarded as a bailment.

At another point Patapoff testified that "Mr. Mohoff and I had an understanding that I could get— ship his seed or store it there and if I shipped, I was to replace it when he wanted it." This testimony could be interpreted to mean either that Patapoff was given the privilege of shipping the seed and replacing it later, in which case the transaction would be a sale, or that Patapoff was not authorized to ship plaintiffs' seed unless *there was on hand* sufficient seed to meet plaintiffs' demand for the return of his seed, in which case the transaction would be a bailment.

Patapoff also testified as follows:

"MR. JOHNSON: If Mr. Mohoff had made demand at any time for the return of his seed, then he would have gotten back the same seed or seed of like kind and quality?

"A  He wouldn't get the same seed, no.

"Q  Would he have gotten seed back of like kind and quality?

"A  Yes.

"Q  Was that your agreement with him?

"A  Yes."

Again the testimony is ambiguous. Patapoff's answers do not make it clear whether he was required to keep on hand at all times a sufficient supply of seed to meet plaintiffs' demands or whether his obligation to return seed of the same kind and quality could be met by obtaining seed from a source other than the supply in the warehouse.

Patapoff further testified as follows:

"Q  Was any of it placed there just for storage?

"A  Well, it was there either for storage or I could ship it if I could replace it.

"Q  How soon were you supposed to replace this?

"A  Whenever he called for it."

Here Patapoff states that he could ship the seed *"if"* he could replace it. This could be interpreted to mean that Patapoff could ship the seed only *if* at the time he made the shipment he had on hand enough seed to satisfy plaintiffs' demand in the event that plaintiff called for the return of the seed. On the other hand, the testimony could be taken to mean that there was no obligation to keep a supply of seed on hand but that when plaintiffs' demanded seed Patapoff would forthwith obtain it either from a supply in the warehouse or from some other source.

Other testimony elicited from Patapoff was equally confusing. He testified as follows:

"Q  *  *  *  Will you tell us again what that understanding was, please?

"A  Well, we agreed that I'd take the grass and the grass seed and either ship it or store it and when we got ready to sell it, I was to either to buy it if we agreed on a price or I was to replace that seed."

Then again:

"Q  Was anything said about replacing seed if you shipped it?

"A  Yes. That was an agreement that if we couldn't—if he was ready to sell it and we couldn't buy it at a competitive price, why we were to replace it."

Patapoff gave no explanation as to what was meant by the statement that he was "to buy it if we agreed on a price" or by the statement that he was to replace the seed if "we couldn't buy it at a competitive price." Defendant's counsel explained this aspect of the agreement to mean that if Patapoff was willing to pay the market price at the time Mohoff was willing to sell he would purchase the seed, but if he did not want to pay that price he would return the seed or seed of equal quality. It appears that the market price of rye grass seed fluctuates markedly resulting from competitive bidding between seed dealers. Plaintiffs argue that the statement "I was to either to buy it if we agreed on a price or I was to replace that seed" described a bailment transaction, prohibiting Patapoff from shipping the seed until plaintiffs named the price at which they were willing to sell.

■ It appears, then, that part of Patapoff's testimony is consistent with the theory of a sale, and part is consistent with the theory of a bailment of fungible goods with a privilege in the bailee to sell from the fungible mass if he keeps on hand an amount sufficient to meet the demands of the bailor. The instruction given by the court permitted the jury to find a bailment only if Patapoff had the obligation to return the identical seed which the Mohoffs had delivered. The instruction was as follows:

"You are instructed that a delivery of seed from a grower to a warehouseman for the purpose of storage only and returned to the grower upon demand is a bailment and not a sale. That is, the seed remains the property of the grower. If you find that the plaintiff delivered the seed in question to said Patapoff or his warehouse upon the agreement for storage only, you are instructed that a bailment resulted and that purchase in exercise of

dominion and control over said seed by Northrup King and Company would constitute a conversion and under those circumstances you would return a verdict for the plaintiff.''

Plaintiff was entitled to have the jury informed of the theory of bailment of fungible goods which we have just described. Therefore, the cause must be remanded for a new trial.

■ Several other assignments of error present questions which may be raised again upon a retrial of the cause. Plaintiffs assign as error the admission into evidence of a copy of a claim filed by plaintiff in Patapoff's bankruptcy proceeding. It was objected to on the ground that it was irrelevant and prejudicial. Defendant used the exhibit for the purpose of showing that plaintiffs submitted their claim in bankruptcy as a debt founded upon an open account because plaintiffs filled out item No. 8 of the claim form which contained the prefatory statement, "If the debt or liability is founded upon an open account." In another paragraph of the form plantiffs state that the consideration for the "debt" is "rye grass seed valued at $8,906.00 *converted* by bankrupt." (Emphasis supplied).

It is defendant's theory that after plaintiffs had delivered their seed to Patapoff they elected to treat the transaction as a sale and that the treatment of the obligation as an open account by filling out item No. 8 of the claim form was consistent with this intent to treat the transaction as a sale. In this respect the exhibit would have some relevance, and would be admissible.

■ An exception was taken to the instruction that plaintiffs would be precluded from recovery if they consented to the disposition of the seed either before

or after it was delivered to defendant. If the consent were given after the violation of the bailment, there would be presented a question of waiver by consent. Upon retrial, if the issue of waiver is properly raised and proved, defendant will be entitled to an instruction explaining that defense.

■ A question was raised at the trial as to the proper measure of damages to be applied to the present case. Where the goods converted have a fluctuating market price, which is true in the case of rye grass seed, the proper measure of damages is the highest value which the commodity reached in the market within a reasonable time after the plaintiffs discovered or had reason to know of the conversion.[9]

The judgment is reversed and the cause is remanded for a new trial.

---

[9] This is the rule stated in 4 Restatement, Torts § 927, comment e (1939), which is followed in most states. See cases cited in Oleck, Damages to Persons and Property, p. 366 (rev ed 1961).

The rule for the measurement of damages where the goods have fluctuated in value after the conversion is not clear from our previous cases. In Eldridge v. Hoefer, 45 Or 239, 245, 77 P 874 (1904) it is said that the measure of damages is the value of the property at the time of the conversion "unless, perhaps, the property is of a fluctuating value, when, under some of the authorities, the highest value at any time between the conversion and the trial will be taken as a basis for estimating the damages. See, 2 Sedgwick, Damages, (8 ed.), § 597, et seq.; Field, Damages, § 798, et seq." However, there is other language in the Eldridge case and in Backus v. West, 104 Or 129, 205 P 533 (1922) which indicates that the time of the conversion is the point at which the value of the property is to be taken. See also, Durham v. Commercial Nat. Bank, 45 Or 385, 77 P 902 (1904).