Argued July 11, 1978, affirmed in part; reversed
in part; and remanded January 23, petition for
rehearing denied February 13, 1979

# LAMB BROTHERS, INC.,
*Respondent/Cross-appellant,*

*v.*

# FIRST STATE BANK OF OREGON,
*Appellant/Cross-respondent.*

## (No. 415-078, SC 25089)

589 P2d 1094

[39]

[40a]

David C. Haugeberg, McMinnville, argued the cause for appellant/cross-respondent. With him on the brief were Frances E. Marsh of Marsh, Marsh & Haugeberg, P. C., McMinnville, and J. W. Rosacker, Portland.

Barnes H. Ellis of Davies, Biggs, Strayer, Stoel & Boley, Portland, argued the cause for respondent/ cross-appellant. With him on the brief was Gregory R. Mowe, Portland.

Before Holman, Presiding Justice, and Tongue, Howell, Bryson, Lent, and Linde, Justices.

BRYSON, J.

## BRYSON, J.

Plaintiff brought this action against defendant bank to recover damages for the negligent sale of collateral by defendant, a secured party. The case was tried without a jury and judgment was entered in favor of plaintiff. Defendant bank appeals. Plaintiff also appeals from the trial court's failure to award certain damages.

Clyde and Franklin Lamb are brothers. Clyde Lamb was the sole owner of all of the shares of plaintiff corporation. Clyde had experience as a stockbroker and desired to establish a business for himself as a broker-dealer but lacked the required capital. Franklin had the necessary capital assets. The brothers agreed, in October of 1973, that Franklin would lend Lamb Brothers, Inc., certain securities as capital for the business Clyde was establishing. Franklin owned 10,000 shares of Reynolds Metals stock, which was registered to Franklin and held by Blythe, Eastman, Dillon & Co., to secure Franklin's margin account of $67,614.49. The brothers contacted defendant bank, on the recommendation of Clyde's accountant, to arrange for a loan with the Reynolds Metals stock as collateral. Defendant bank made an original loan of $70,000 to Franklin on his note. The bank paid Blythe, Eastman, Dillon $67,614.49, who then forwarded the 10,000 shares of Reynolds Metals to the bank. The bank forwarded the balance of the loan to plaintiff. The price of the Reynolds shares varied, of course, but at the time of the negotiations with the bank, late in 1973, it was valued at approximately $200,000.

Certain relevant events occurred in the following chronological order.

Mid-September, 1973: Plaintiff Lamb Brothers, Inc., was incorporated as a brokerage firm. Clyde was the sole stockholder.

[41]

October, 1973: Clyde and Franklin Lamb agreed that Franklin would provide assets for Clyde's business.

October-November, 1973: Clyde and Franklin entered into negotiations with defendant bank for a loan.

November 6, 1973: Defendant bank approved a line of credit to *Franklin* Lamb.

November 6, 1973: Defendant bank loaned *Franklin* Lamb $70,000 on his note, which was secured by the 10,000 shares of Reynolds Metals. Franklin signed a pledge agreement in the bank's favor and the 10,000 shares of Reynolds was forwarded to the bank, as previously set forth.

January 8, 1974: Defendant bank loaned Franklin an additional $30,000 with the same security. Franklin turned the money over to Lamb Brothers, Inc.

March 28, 1974: The Securities and Exchange Commission gave approval to plaintiff to act as a broker-dealer, and plaintiff began operation in May, 1974. Plaintiff was also registered as a broker-dealer by the Oregon Corporation Commissioner to do business in Oregon pursuant to ORS 59.165 et seq. Franklin and plaintiff executed a subordination agreement required by the Securities and Exchange Commission to establish plaintiff's required capital.

March 29, 1974: The bank transferred the loan made to Franklin personally to Lamb Brothers, Inc., in the amount of $100,000. Plaintiff Lamb Brothers, per Clyde Lamb, the sole shareholder, signed a 90-day promissory note in favor of defendant bank for $100,000. Franklin, as guarantor, signed a guarantee agreement in favor of the bank to pay plaintiff's indebtedness in the amount of $100,000 and granted the bank the right to extend the time for payment "without the consent from the Guarantor." Franklin also executed an "Hypothecation Agreement" pledging the 10,000 shares of Reynolds Metals as collateral for the loan. Plaintiff orally pledged the Reynolds shares with defendant as security for the loan.

[42]

The evidence shows that Franklin was the owner of the Reynolds shares subject to the previously mentioned indebtedness. Plaintiff used the Reynolds shares, received as a loan from Franklin, as evidenced by a subordination agreement between Franklin and Lamb Brothers, Inc., to satisfy the Securities and Exchange Commission capital requirements. Plaintiff also used Franklin's Reynolds shares as collateral for the loan from the bank. At this same time, Franklin signed guarantee and pledge agreements in favor of the bank for payment of plaintiff's notes to the bank and executed an hypothecation agreement on the Reynolds shares, as previously mentioned. The bank had possession of the Reynolds shares at all times.

June 27, 1974: Lamb Brothers signed a 90-day renewal note for $100,000.

September 25, 1974: Lamb Brothers signed a 30-day renewal note for $100,000.

October 3, 1974: Lamb Brothers signed a 22-day note for an additional loan of $11,314. The total loan was $111,314, with interest.

October 25, 1974: This was the due date for the Lamb Brothers' promissory notes. The notes were not renewed and were not paid.

In the meantime, plaintiff, acting through Clyde, experienced financial difficulty by buying stocks without sufficient funds in plaintiff's bank account with defendant to cover the check for the purchase. Ultimately, defendant dishonored plaintiff's check in the amount of $183,624.65 to Foster & Marshall, which was tantamount to putting Lamb Brothers out of business.

Indeed, on October 29, 1974, the Corporation Commissioner gave "Notice of Taking Possession" to Lamb Brothers, Inc., stating in part:

"The Corporation Commissioner has ascertained that the capital of Lamb Brothers, Inc., a registered

[43]

broker-dealer in securities is impaired and that the affairs of said firm are in an unsound condition, more particularly, said firm is unable to meet its obligations as they fall due. Therefore, proceeding in the manner provided in such cases under the Oregon Securities Law (ORS 59.265), you are hereby,

"NOTIFIED, that the Commissioner is taking possession of all the property, business and assets of Lamb Brothers, Inc., and shall retain possession of the same pending further proceedings, * * *."

On October 29, 1974, defendant wrote to plaintiff advising that the bank had received "an official 'Notice of Taking Possession' " from the Corporation Commissioner and notified plaintiff that it would sell the Reynolds Metals shares to "payoff [sic] the loan to Lamb Brothers, Inc., in the amount of $111,314.00 plus interest to the date of sale."

On December 18, 1974, Reynolds shares declined to $14 per share on the market, and defendant sold 800 shares at $14. Plaintiff asserts that thereafter the parties agreed that the bank would not sell any more collateral if plaintiff supplemented the collateral. Franklin appeared at the bank on December 18 to supplement the collateral, but the bank refused his tender. Thereafter, on the evening of the 18th, Clyde and Franklin agreed with the Corporation Commissioner that if plaintiff paid $5,000 to one of its creditors the commissioner would tell the bank to quit selling stock. On the 19th of December, when sufficient money to pay the creditor was delivered, the commissioner told the bank to cancel the sale. The bank tried to cancel the sale order on the Reynolds shares but it was too late. The broker had completed the sale. Three thousand shares were sold at $14 per share. In any case, the bank did not agree or promise plaintiff that it would cancel the sale.

In the afternoon of December 19 a bank official introduced a Corporation Commission employee to Harris Upham & Co., the bank's broker. The bank told

[44]

Harris Upham that the Commission employee had authority to sell stock on defendant's account. The Corporation Commissioner then ordered the remaining 6,200 Reynolds shares to be sold. They were sold on December 20, 1974, at prices between $13.50 and $13.75 per share. The price of Reynolds shares on the New York Stock Exchange subsequently increased.

A summary of the sales of Reynolds Metals, the price received by defendant bank, and the excess of funds received from the sales over the amount due the bank is as follows:

| Sale Date | Shares Sold | Price/ Share | Gross Amt. Received | Net Rec'd by Bank After Broker's Fees, Taxes & Postage |
|---|---|---|---|---|
| 12-18-74 | 800 | $14.00 | $11,200 | $10,957.64 |
| 12-19-74 | 3,000 | 14.00 | 42,000 | 41,327.76 |
| 12-20-74 | 600 | 13 3/4 | 8,250 | 8,137.49 |
| 12-20-74 | 200 | 13 5/8 | 2,725 | 2,687.58 |
| 12-20-74 | 5,400 | 13 1/2 | 72,900 | 71,889.82 |
| | | | | $135,000.29 |
| | Amt. due bank (principal) | | | 111,314.00 |
| | Excess of funds received | | | $ 23,686.29 |

The record shows that the bank was in possession of the 10,000 shares of Reynolds Metals stock at all times after it made the original loan and paid off the margin account of $67,614.49 to Blythe, Eastman, Dillon & Co.; that plaintiff is no longer registered or doing business as a broker-dealer, and its general creditors have been paid.

On March 7, 1975, defendant filed an interpleader suit in the Circuit Court of Multnomah County, No. 413649, with Franklin P. Lamb and Lamb Brothers, Inc. (plaintiff in this case), as defendants and tendered into the court registry the sum of $20,667.79, which the bank alleged was the balance remaining after satisfying the balance due on defendant's notes.[1]

---

[1] Defendant's brief states "[t]he case was ultimately settled with the balance going to Lamb Brothers, Inc." No page reference is made to such testimony and from our review of the lengthy transcript, we have been unable to find whether or not the case was settled and Lamb Brothers, Inc., received the sum tendered into the court registry.

[45]

Plaintiff's complaint alleges that "[o]n or about March 29, 1974, plaintiff orally pledged the Reynolds shares with defendant as security for a loan from defendant to plaintiff in the amount of $100,000" and that defendant was negligent in several respects in selling the collateral for the loan, the 10,000 Reynolds Metals shares.

Both parties assert that the trial court erred in making certain findings of fact and that the evidence does not support such findings. The trial court entered findings, in part, as follows:

"1. Plaintiff pledged 10,000 shares of Reynolds Metals common stock ('RLM') as collateral for loans from defendant to plaintiff in the amounts of $100,000 and $11,314, at least as of March 28, 1974.

"* * * * *

"3. Defendant was negligent in disposing of the collateral in the second and third sales (but not in the first sale of 800 shares) in the following particulars:

"a. In placing an order to sell, selling and delivering plaintiff's collateral, without plaintiff's authorization and over plaintiff's objection, at a depressed price level when such action was not reasonably necessary to protect defendant's interest and was for the benefit of third-party creditors of plaintiff who had no right to or interest in the collateral.

"b. In refusing to accept the timely supplementation of collateral tendered to defendant.

"c. In concealing from Harris Upham and Company, upon Harris Upham's request for documentation of defendant's right to sell the Reynolds shares, any of the documentation in defendant's possession showing plaintiff's ownership rights in the shares.

"d. In failing to void the second sale transaction involving 3,000 shares of the Reynolds stock subsequent to an agreement by defendant to cancel the sell order, and in failing to promptly advise plaintiff of the mistaken sale transaction.

[46]

"e. In selling the Reynolds shares in such a manner as to depress the market price and reduce the proceeds realized upon sale of the collateral.

"f. By taking actions at the request of the Oregon Corporation Commissioner to plaintiff's detriment, without notice to plaintiff of such requests, when the Commissioner had no authority, and defendant knew, or in the exercise of reasonable care should have known, that the Commissioner had no authority to so act.

"4. The second and third sales were not commercially reasonable in that the sales were not in conformity with reasonable commercial practices under the circumstances.

"* * * * *.

"7. At the time of the second and third sales the Corporation Commissioner was without authority to direct the liquidation of the collateral, and defendant was not justified in following the directions of the Commissioner.

"8. As of October 25, 1974, the $100,000.00 and $11,314.00 loans were unpaid, although due, and so remained through December 20, 1974."

Other than the court's finding that defendant was not negligent in the first sale of 800 Reynolds shares by defendant, the findings are primarily a recitation of the allegations of plaintiff's complaint.

We will first consider defendant's assignments of error pertaining to the court's findings of fact. Defendant asserts that the court erred in making the findings of negligence, as set forth above in paragraph 3 of the findings, and that the findings as made are inconsistent and do not establish a basis for a valid judgment.

Suffice to say that from the evidence and documents introduced at trial, plaintiff and defendant

[47]

clearly intended to create a security interest; therefore, this case is governed by Article 9 of the Uniform Commercial Code, ORS chapter 79.[2]

From our examination of the court's findings, it is evident that the findings, like the allegations in the complaint, relate to both pre-default and post-default theories of negligence, each of which is covered separately under the provisions of Article 9 of the Uniform Commercial Code, ORS ch 79, dealing with secured transactions such as involved in this case. Where the secured party, defendant, has possession of collateral and the debtor is *not in default*, the secured party can be negligent if he fails to use reasonable care. ORS 79.2070 provides:

> "(1) A secured party must use reasonable care in the custody and preservation of collateral in his possession. In the case of an instrument or chattel paper reasonable care includes taking necessary steps to preserve rights against prior parties unless otherwise agreed.
>
> "* * * * *
>
> "(3) A secured party is liable for any loss caused by his failure to meet any obligation imposed by [subsection] (1) * * * of this section but does not lose his security interest.
>
> "* * * * *."

---

[2] ORS 79.1020 provides in part:

"(1) Except as otherwise provided in ORS 79.1040 on excluded transactions, ORS 79.1010 to 79.5070 apply:
"(a) To any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures including goods, documents, instruments, general intangibles, chattel paper or accounts * * *.
"* * * * *.
"(2) ORS 79.1010 to 79.5070 apply to security interests created by contract including pledge, assignment, chattel mortgage, chattel trust, trust deed, factor's lien, equipment trust, conditional sale, trust receipt, other lien or title retention contract and lease or consignment intended as security. * * *.
"* * * * *."

Corporate shares are instruments:  ORS 79.1050(1)(i); 78.1020.

Where the secured party, defendant, disposes of collateral *after default,* ORS 79.5040 provides:

"(1) A secured party after default may sell, lease or otherwise dispose of any or all of the collateral in its then condition or following any commercially reasonable preparation or processing. * * *.

"(2) If the security interest secures an indebtedness, the secured party must account to the debtor for any surplus, and, unless otherwise agreed, the debtor is liable for any deficiency. * * *.

"(3) Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable. * * *."

The trial court specifically refused to rule on the default issue. After plaintiff had filed its proposed findings of fact with the trial court the defendant filed objections thereto and offered substitute findings of fact in lieu thereof. The trial court had a hearing on the issue and the following occurred.

"[Defendant's counsel]: * * * [W]e suggest there should be a finding of default, that Plaintiff was in default on the promissory note at the time the stock was sold. This was admitted by Clyde Lamb on the stand. There is no evidence to the contrary, and it's critical for our position.

"THE COURT: * * * But does that alter the theory at all?

"[Defendant's counsel]: Well, I think it certainly is relevant to our legal theory. * * * In my opinion, Your Honor, it makes your opinion wrong, but that's why I would like it included.

"[Plaintiff's counsel]: * * * [I]f you recall the testimony of when this agreement arrangement was

[49]

originally entered into, particularly the testimony of Mr. Wagner about this being a long-term arrangement and the various sorts of efforts that would be made if the loan were not to be repaid in a given time and what the bank's expectations were about repayment and renewal, I think that the word 'default' is a word that's much too strong under these circumstances and I would object to that word being used to apply to this loan.

"THE COURT:  * * * I am going to substitute for the stricken 8 the following language: 'As of October 25, 1974, the $100,000 and $11,314 loans were unpaid, although due, and so remained through December 20, 1974.' * * *."

Defendant's counsel also requested that the trial court's conclusions of law provide that plaintiff was in default, but the court declined to so conclude. Both parties requested written findings and conclusions.

■  The evidence clearly establishes a default on the part of plaintiff in the payment of its notes to defendant. Clyde Lamb testified:

"Q  It's a fact, is it not, that from October 29th or the—October 25, 1974, until December 18th of '74 that [the] loan was in default, was it not?

"A  Yes."

The trial court, while it refused to hold as a matter of law that the plaintiff was in default, did find that the "loans were unpaid, although due, and so remained through December 20, 1974."

Plaintiff's brief acknowledges that the trial court refused to make any findings with respect to default but argues that defendant did not expect repayment out of plaintiff's operational income "for a year or two or three." From this, plaintiff evidently expects the court to draw an inference that the defendant did not expect to be paid at all for that period of time and that

the due dates on the promissory notes were to be disregarded. However, plaintiff's citation to the transcript does not support such an inference; indeed, the witness for the bank specifically testified that although it was not an uncommon banking practice to use 90-day notes and renew them on a regular basis, "[t]hat was not the case here." The only evidence is that the loans were in fact due on October 25, that the bank was not obliged to renew, and that plaintiff failed to pay the notes. Therefore, plaintiff was in default. It follows that defendant is liable to plaintiff for the sale of the collateral only to the extent that the sale was not in accordance with commercially reasonable standards.

The first part of the following discussion of commercial reasonableness relates to the sale of such stock as was necessary to cover the debt. We later discuss the stock sold by defendant after defendant had sold enough to cover the entire debt.

We therefore review the trial court's findings to determine whether they support the judgment for plaintiff on these grounds.

■ Some of the findings (part 3a; 3e; 4) suggest that defendant failed to observe commercially reasonable standards in the way it sold the stock. However, these findings are not supported by the evidence because of ORS 79.5070(2), which provides in part:

> "(2) The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner. If the secured party either sells the collateral in the usual manner in any recognized market therefor or if he sells at the price current in such market at the time of his sale or if he has otherwise sold in conformity with reasonable commercial practices among dealers in the type of property sold he has sold in a commercially reasonable manner. * * *"

The New York Stock Exchange is certainly a recognized market for the sale of corporate shares when those shares are listed on that market and so, under ORS 79.5070(2), defendant cannot be liable for obtaining an inadequate price.

The trial court found (part 3a, 3f) that defendant did not have the proper motive in selling the collateral. However, motive is irrelevant. The bank had the right to sell the collateral after default, pursuant to ORS 79.5040(1), to satisfy plaintiff's notes. In the context of a sale of collateral after default, the duty to act in good faith is covered by the requirement that the sale be made in a commercially reasonable manner. There is no additional requirement that the secured party have a specific mental attitude.[3]

The trial court also found the defendant was negligent in refusing to accept supplementation of collateral tendered to it. The evidence read most favorably to the plaintiff only shows that the bank offered Lamb Brothers and Franklin Lamb the opportunity to supplement collateral for the loan. If they did so, in the time and manner prescribed, then the bank would not sell until the Reynolds shares reached a low of $12 on the market. Clyde Lamb did not bring any extra collateral to the bank. Clyde testified that after the bank made the first sale of 100 shares he talked to Mr. Wagner of the bank regarding possible sources for supplementation to the security for the loan.

"Q And what did you say and what did he [Mr. Wagner of bank] say?

"A I don't really recall. * * * There was some scratching around that we had done and would still do more and that I thought that we could raise

---

[3] After default, usually the debtor's only concern is to make sure that the secured party receives a reasonable price in selling the collateral. As long as a reasonable price is obtained, the debtor has no grounds for complaint about the way the sale was conducted. *See* discussion in J. White and R. Summers, Handbook of the Law Under the Uniform Commercial Code § 26-11 (1972).

another 5,000, for a total of ten; and he said that would be fine, but it would have to be brought to the bank before the close of business, and I asked him if he would hold off for a couple of days and he said no, that their position now was that in the absence of hard cash coming through the door [meaning the Corporation Commissioner had taken over plaintiff], they would resume selling in the morning, or the broker had been instructed and they wouldn't countermand the order unless they had had something in hand.

"Q Were you present on the afternoon of the 18th of December when Franklin may have attempted to supplement that collateral?

"A I wasn't there. * * *."

Franklin Lamb, by deposition, testified that Wagner was interested in "cash" for supplemental collateral:

"* * * He's interested in cash. He was very specific about that. And I said, 'Will you take the bank manager's word up at Pacific First Federal'—well, I'm not sure the name of the bank in Tacoma. And he said, 'No. That won't do.' I said, 'Well, will you take a telegram from him?' He said 'No. It's got to be cash.' "

Franklin Lamb did go to the bank shortly before 5 o'clock on the appointed day but the evidence shows he did not produce cash and the bank refused to accept Franklin's tender. We further note from Clyde's testimony that Franklin was not an agent, officer or employee of Lamb Brothers, Inc.

The trial court's finding (3c) that the bank did not inform its broker, Harris Upham & Co., of plaintiff's rights in the Reynolds shares is irrelevant. Such a concealment, if any, from Harris Upham & Co. might be grounds for that firm or a subsequent purchaser to complain. However, the facts do not show that it was unreasonable with respect to plaintiff, which is

[53]

the issue in this case. Similarly, finding 3d is irrelevant because failure to cancel a sale of the shares, after default, was unreasonable only to the extent that the sale might be in excess of that required to produce sufficient funds to satisfy the defaulted notes.

Before discussing defendant's sixth and seventh assignments of error and from our above conclusions, we point out that defendant is not entirely absolved of liability because defendant is liable for the stock it sold beyond that necessary to produce sufficient funds to satisfy the debt.

■ Defendant cites ORS 79.5040(1) for the proposition that a "secured party after default may sell * * * any or all of the collateral * * *." However, this right to sell is subject to the requirement that a debt still remains unpaid to defendant. Once the secured party has sold enough of the collateral to cover the debt there is no further reason to continue selling.

This brings us to the rule of damages to be applied where the secured party unnecessarily sells excessive amounts of security.

■ ■ The normal measure of damages where there has been a failure to sell in a commercially reasonable manner is the difference between the price actually obtained and the price that could have been obtained by proceeding in a commercially reasonable manner. See J. White and R. Summers, Handbook of the Law Under the Uniform Commercial Code § 26-11 (1972). In this case, however, plaintiff's complaint alleges that defendant was negligent in placing an order to sell the shares at all and not that defendant failed to sell in a commercially reasonable manner. In such a case, given the fluctuating value of the shares, we conclude that the correct measure of damages is that adopted in *Mohoff v. Northrup King & Co.*, 234 Or 174, 182, 380 P2d 983 (1963) (a conversion case):

> "* * * Where the goods converted have a fluctuating market price, * * * the proper measure of damages

is the highest value which the commodity reached in the market within a reasonable time after the plaintiffs discovered or had reason to know of the conversion." (Footnote omitted.)[4]

The damages on remand are to be calculated on the basis of the highest value the stock reached within a reasonable time after the sale of the Reynolds shares which were in excess of that required to satisfy plaintiff's indebtedness.

▪ As a second string to its bow, defendant also argues that it should not be liable for the second and third sales of Reynolds shares because it made them pursuant to the Corporation Commissioner's orders. Both parties discuss this issue in their briefs. As plaintiff correctly points out, the Commissioner had no authority to sell. ORS 59.265 provides in part:

"(1) When the commissioner ascertains that the assets or capital of any broker-dealer or investment adviser are impaired, or that such person's affairs are in an unsound condition, he may take possession of all the property, business and assets of such person located in this state and retain possession of them pending the further proceedings specified in this section. The commissioner shall inventory the assets and liabilities of such person. The commissioner shall file one copy of the inventory in his office and one copy in the office of the clerk of the circuit court of the county in which the principal place of business of such person is located, and shall mail one copy to each shareholder or partner of such person at his last-known address. The clerk of the court shall file the inventory as a pending proceeding and give it a docket number.

---

[4] Dobbs, Remedies § 514, at 404, states "the 'New York rule,' give[s] the plaintiff the highest value between the date he had notice of conversion and a reasonable time for *replacement* thereafter. * * *" (Emphasis added.)

*See also* 4 Restatement, Torts § 927, Comment e.

"(2) If any person refuses to permit the commissioner to take such possession, the commissioner may apply to the circuit court of the county in which the principal place of business of such person is located for an order appointing a receiver, who may be the commissioner, to take such possession.

"(3) If the deficiency in assets or capital has not been made good or the unsound condition remedied within 60 days from the date when the commissioner or receiver took possession, the property, business and assets of such person located in this state shall be liquidated. If a receiver has not been appointed, the commissioner shall apply for such appointment by the court in which the inventory was filed. The liquidation shall proceed as provided by law for liquidation of a private corporation in receivership.

"* * * * *."

This statute gives the Commissioner the power to freeze the assets of broker-dealers and it gives him the power to liquidate the assets. However, this power is clearly limited by the statute and the assets can only be sold after 60 days following the date of seizure. However, as we have concluded, the notes were in default and the defendant had a right to sell such portion of the collateral in his possession as was necessary to satisfy plaintiff's notes. The sale of the shares were actually made through defendant's account at Harris Upham & Co. The perilous financial condition of plaintiff and the intercession of the Corporation Commissioner complicate the facts but do not affect defendant's right to sell the collateral in its possession.

Defendant also contends that the court erred in not joining Franklin Lamb as a party in this action. Defendant bank filed a plea in abatement as an affirmative defense, contending that Franklin Lamb should be joined as a necessary party and alleged most of the facts previously set forth. The plea in abatement also alleged as follows:

[56]

"'* * * * *.

"Franklin Lamb should be joined as a necessary party pursuant to the provisions of ORS 13.100 [13.110]. Unless Franklin Lamb is joined as a party defendant, he will be free to institute a separate, subsequent action against Defendant First State Bank to recover for the identical loss claimed by Plaintiff. Joinder of Franklin Lamb will assure resolution of the issue of title and priorities to said 10,000 shares of Reynolds Metals stock.

"WHEREFORE, Defendant First State Bank prays:

"'* * * * *.

"(2) for an order abating this action until such time Franklin Lamb has been joined as a necessary party herein."

Plaintiff moved to strike this affirmative defense, and the motion was granted by the presiding judge. Defendant argues that it is necessary to join Franklin "to prevent double recovery against the defendant."

ORS 13.110 provides:

"In actions or suits the court may determine any controversy between parties before it, when it can be done without prejudice to the rights of others, or by saving their rights; but when a complete determination of the controversy can not be had without the presence of other parties, the court shall cause them to be brought in."[5]

Plaintiff argues that "even if the trial court committed error in not requiring joinder of Franklin Lamb, any error committed would not require a new

---

[5] Rule 29 of the proposed rules promulgated by the council on court procedures (Oregon Advance Sheets No. 34, Volume 78, Appendix at 53 (1978)) would modify and change this statute, making it similar to Rule 19 of the Federal Civil Rules on the subject. See 7 Wright and Miller, Federal Practice and Procedure 3 (1972).

trial on defendant's liability. Defendant's liability and defenses have been fully litigated; the proper remedy for any error in joinder of parties is simply to remand for modification of the judgment entered." (Citing *Marx v. Lenske/Krause*, 263 Or 90, 95-96, 500 P2d 715 (1972).)

■ The subordination agreement between Franklin and plaintiff provided in part as follows:

> "W I T N E S S E T H:
>
> "THAT WHEREAS, it is the intention and purpose of the parties hereto that Lender lend to the Dealer certain property of the Lender under circumstances which will constitute a satisfactory subordination agreement within the meaning of Rule 15c3-1 of the Securities Exchange Act of 1934, now, therefore,
>
> "(1) Lender hereby lends to Dealer certain securities, according to a list attached hereto [includes to 10,000 shares of Reynolds Metals], which securities had closing prices totalling $232,500 as of October 11th, 1973, and Lender does hereby lend to Dealer an additional sum of $* * * 00.00 * * * in cash, all for a term of not less than one year.
>
> "(2) It is understood and agreed between the parties hereto that the rights of the Lender to demand or receive payment or return of the cash or securities herein loaned shall be subordinate to the claims of all present and future general creditors of Dealer.
>
> "* * * * *
>
> "(7) It is agreed that any Securities or other property herein loaned to Dealer may be used and dealt with by Dealer as part of its capital and shall be subject to the risks of its business."

This agreement created a bailment. We defined a bailment in *Kantola v. Lovell Auto Co.*, 157 Or 534, 538, 72 P2d 61 (1937), as "a delivery of something of a personal nature [in other words, personal property] by one party to another, to be held according to the

[58]

purpose or object of the delivery, and to be returned or delivered over when that purpose is accomplished * * *."

■ We have found no Oregon cases on the right of a bailor or a bailee to sue third persons who injure or convert the bailed property, and no cases have been cited to us. However, the settled rule is that either the bailor or the bailee can sue the wrongdoer, but a recovery by one bars the other from double recovery against the wrongdoer.[6] Brown, The Law of Personal Property § 11.11 (3d ed 1975); Note, Recent Cases, 19 Or L Rev 61 (1939).

■ The defendant argues that it is not concerned with Franklin's problems but it wants to prevent double recovery against itself. The rule precluding one of the parties to a bailment from bringing action after a successful action by the other party affords defendant this protection against double liability.

Plaintiff also cross-appeals and argues that the trial court erred in finding that defendant properly sold the first 800 shares of Reynolds. As discussed above, defendant had a right, pursuant to the statute, to sell the shares after plaintiff's default and therefore the trial court's finding was not in error.

Plaintiff next argues that the trial court erred in refusing to rule on plaintiff's allegation of conversion. The only shares of Reynolds that defendant could have converted were those shares it sold after sufficient shares were sold to satisfy plaintiff's indebtedness. We have previously discussed the applicable rule of damages in this case. Nevertheless, plaintiff argues that the trial judge's computation of damages

---

[6] " '* * * As between bailor and bailee the real interests of each must be inquired into, and, as the bailee has to account for the thing bailed, so he must account for that which has become its equivalent and now represents it. What he has received above his own interest he has received to the use of his bailor. The wrongdoer, having once paid full damages to the bailee, has an answer to any action by the bailor.' " (Footnote omitted.) Brown, Personal Property 312, § 11.11 (3d ed 1975).

was improper. Plaintiff's brief does not discuss *Mohoff v. Northrup King & Co., supra.* We realize that plaintiff brought this action on a negligence theory and *Mohoff* was a case of conversion. Plaintiff contends that it should recover the highest market value of the stock between the sale and the time of trial. The reasoning of Justice O'Connell in *Mohoff*, wherein he reviewed the earlier Oregon cases, seems the most reasonable rule to this court. If we were to adopt plaintiff's theory, the defendant would have to pay more for negligently injuring property having a fluctuating value than it would have to pay for converting it. The law should not encourage such an anomaly.

The final question before us is the proper disposition of this case in light of the above discussion. *Community Bank v. U. S. Bank*, 276 Or 471, 478-79, 555 P2d 435 (1976), is a similar case involving the Uniform Commercial Code and conclusions of law based on statutory construction, which is subject to review by this court, where there were inadequate findings of fact. In *Community Bank* we remanded the case "for further findings of fact, and for entry of the appropriate judgment based upon those findings," citing *Briscoe v. Pittman*, 268 Or 604, 522 P2d 886 (1974); *Anderson v. Waco Scaffold & Equip.*, 259 Or 100, 104, 485 P2d 1091 (1971).

In the case at bar, the court heard all of the evidence and nothing would be gained by remanding for a new trial. Also, the court must determine if the $20,667.79 paid into the court registry by defendant was received by plaintiff and if so, the judgment should reflect such a credit. The case is remanded for further findings of fact to determine the number of shares of Reynolds sold by defendant in excess of that necessary to satisfy plaintiff's debt and the damages therefor in accordance with the rule herein established and to determine if defendant is entitled to the above credit; and for entry of the appropriate judgment based on those findings.

[60]

Affirmed in part; reversed in part; and remanded for further proceedings consistent with this opinion.