**SUFFIELD BANK**

v.

**David F. LaROCHE.**

**Civ. A. No. 90–0038L.**

United States District Court, D. Rhode Island.

Dec. 6, 1990.

56

Gerald J. Petros, Hinckley Allen Snyder & Comen, Providence, R.I., for plaintiff.

Barry J. Kusinitz, Providence, R.I., for defendant.

## MEMORANDUM AND ORDER

LAGUEUX, District Judge.

The matter presently before the Court revolves around the counterclaim of defendant David LaRoche ("LaRoche") for set-off against his debt to plaintiff Suffield Bank ("Bank"). On May 9, 1990, this Court granted the Bank's motion for partial summary judgment on the question of LaRoche's liability to the Bank for default on a promissory note. The only questions remaining were the amount of recovery by plaintiff on the complaint and the amount of set-off, if any, on the counterclaim. The parties waived a trial on those issues and instead submitted an agreed statement of facts. The Court took the matter under advisement.

As collateral for a loan from Suffield Bank, LaRoche pledged shares of stock of NECO Enterprises ("NECO"), a corporation of which he is chief executive officer. LaRoche later defaulted on the loan and the Bank sold those shares. As a result of the sales, LaRoche may have incurred liability to the NECO stockholders under the "Short–Swing Profits" provision of the Securities Exchange Act. LaRoche now counterclaims to set off this possible liability to NECO against his debt to the Bank.

Whether a debtor may set-off short-swing profits liability is a question of first impression. For the reasons set forth below, defendant LaRoche cannot prevail on his counterclaim.

## I. BACKGROUND

On November 4, 1988, LaRoche signed and delivered a promissory note in the amount of $685,004.75 to Suffield Bank, a Connecticut savings bank. The note was signed as part of a comprehensive settlement of litigation then outstanding between the Bank and LaRoche in this Court.

The note was secured by a pledge and security agreement under which LaRoche pledged 13,782 shares of NECO stock and 6000 shares of Homeowners Federal Savings Bank ("Homeowners") stock. The note was also secured by a second mortgage on land known as "Sherwood Plat," which is located in Portsmouth, Rhode Island.

The pledge provided that, on LaRoche's default, the Bank could accelerate the note such that all interest, principal and late payments would become due immediately, and the Bank could then sell all pledged collateral in any manner permissible under applicable Rhode Island law. At the time of the pledge, LaRoche notified the Bank that because he was a director and an officer of NECO and because he owned more than ten percent of all NECO stock, the 13,782 shares were "control stock" subject to the restrictions of § 16(b) of the Securities Exchange Act of 1934 ("§ 16(b)"). 15 U.S.C. § 78p(b).

LaRoche failed to make the interest payments due under the note on November 1, 1989, and December 1, 1989. On January 1, 1990, LaRoche failed to make both the interest payments and the first principal payment. The Bank wrote to LaRoche on January 5, 1990, to notify him of his default and of its decision to accelerate the note. The Bank also advised LaRoche that if it did not receive full payment of all interest, principal and late charges due by

January 15, 1990, it planned to exercise its right to sell the NECO and Homeowners stock. The NECO stock was, by this time, the only collateral pledged from which the Bank was able to recover any part of LaRoche's debt. Sherwood Plat could not be reached because it was entangled in litigation; the Homeowners stock had virtually no value and Homeowners was being operated by an agency of the federal government.

LaRoche did not respond to the Bank's letter with payment and did not make any attempt to renegotiate the terms of the note. After being notified of his default, LaRoche continued to purchase shares of NECO stock on the American Stock Exchange. LaRoche wrote to the Bank, on January 15, 1990, to warn that NECO stock must be "liquidated in a commercially reasonable manner" and stated that "my stock is deemed 144 stock, or control stock, and must be liquidated in accordance with relative [sic] rules and reporting requirements." Defendant's Trial Memo, page 2.

On January 16 and 17, the Bank sold 13,682 shares of the NECO stock through a broker-dealer at the market price on the American Stock Exchange. In response to this sale, several shareholders of NECO brought an action against LaRoche to recover any short-swing profits made on the 13,682 shares sold, under Section 16(b) of the Securities and Exchange Act of 1934. For the purposes of the present litigation, the Bank and LaRoche agree that LaRoche's potential short-swing profit liability (the difference between the purchase and sale prices if both transactions take place within six months) totals $74,584.33.[1]

On January 29, 1990, the Bank filed suit against LaRoche to recover the balance due on the promissory note. LaRoche counterclaimed in February, 1990, requesting set-off for the potential short-swing profit lia-

bility he incurred as a result of the Bank's sale of the collateral. On May 9, 1990, this Court granted the Bank's motion for partial summary judgment, ruling that LaRoche was liable to the Bank for his default on the promissory note. The amount of recovery and the amount of set-off are presently in order for decision.

An additional issue concerns NECO stock generated by a stock split. In the spring of 1990, NECO stock split, two and one half new shares for every share owned. NECO's issuing agent issued the 4680 newly-created shares directly to LaRoche. LaRoche has not responded to several demands by the Bank to turn over these shares as required by the terms of the pledge agreement. The Bank has requested an order issue to LaRoche to transfer those shares to the Bank.

## II. DISCUSSION

Defendant LaRoche alleges that he is entitled to set-off because the Bank's sale of the collateral was not "commercially reasonable." This argument fails because under Rhode Island's version of the Uniform Commercial Code ("U.C.C."), a sale of collateral on a "recognized market" is irrefutably commercially reasonable.[2] R.I.Gen. Laws § 6A–9–507(2) (1985).

LaRoche raises several arguments that set-off should nevertheless be allowed because the recognized market exemption is inapplicable to this case. The Court finds none of these arguments persuasive. Allowing set-off would permit LaRoche to transfer his liability to the corporation and other shareholders to plaintiff Bank. This would frustrate the very purpose of § 16(b) of the Securities and Exchange Act. Further, Article Nine of the U.C.C. does not provide the debtor who sustains secondary injuries the recourse of set-off. Finally, in

---

1. After the original pledge, LaRoche delivered an additional 3120 shares of NECO stock to the Bank in accordance with the terms of the pledge agreement. On June 22, 1990, the Bank sold the additional 3120 shares of NECO stock. LaRoche makes no claim concerning the Bank's sale of these shares because LaRoche bears no short-swing liability for them since his original

purchase price exceeded the sale price which the Bank received on June 22, 1990.

2. Rhode Island has incorporated the Uniform Commercial Code verbatim into Title 6A of the Rhode Island General Laws (1985 Reenactment). Thus, all references to the Uniform Commercial Code refer to the corresponding section of Title 6A.

selling the stock the Bank met the standard of "good faith" required by the U.C.C.

## A. COMMERCIAL REASONABLENESS

In his counterclaim, LaRoche asserts that because the Bank's sale of the pledged NECO stock created his liability to the NECO stockholders pursuant to § 16(b), it was not a "commercially reasonable" sale, and he is therefore entitled to set off that liability against his outstanding debt to the bank.

Under Article Nine of the U.C.C., the proceeds of the disposition of collateral are applied to reduce the obligation of the debtor. *Id.* at § 6A–9–504(1). To protect the debtor's interest in a high sale price, Article Nine requires that "every aspect of the disposition including the method, manner, time and place must be commercially reasonable." R.I.Gen.Laws § 6A–9–504(3). Furthermore, if the secured party does not make a reasonable effort to sell the collateral at its fair market value, "the debtor is entitled to set off or counterclaim for the amount which a reasonable disposition would have realized." *Matter of Deephouse Equip. Co.,* 38 B.R. 400 (Bankr.D. Conn.1984) (Citing U.C.C. § 9–507(1)).

■ LaRoche suggests that this Court has great discretion as to the factors it may consider in determining the commercial reasonableness of a secured party's sale. While this may be true in some circumstances, the Court's discretion is very limited where, as in the case at bar, the secured party sold the collateral on a "recognized market."

■ The drafters of the U.C.C. reasoned that selling to the highest bidder on a publicly recognized market will yield the fair market price. Accordingly, Article Nine provides that a secured party by selling collateral on a recognized market renders the sale commercially reasonable and thus shields itself from liability.

■ The plain language of the relevant U.C.C. portion states that: "If the secured party sells the collateral in the usual manner in any recognized market ... he has sold it in a commercially reasonable man-

ner." R.I.Gen.Laws § 6A–9–507(2). Major stock exchanges are clearly recognized markets. *See Ocean National Bank v. Odell,* 444 A.2d 422, 426 (Me.1982). Therefore, by selling the NECO stock on the American Stock Exchange, the Bank ensured that its sale was commercially reasonable and beyond the scrutiny of this Court.

## B. TRANSFER OF LIABILITY

■ LaRoche argues that the "recognized market" provision is inapplicable to this case and therefore cannot render the Bank's sale commercially reasonable. He contends that the Bank's sale was prohibited under the Short–Swing Profit provision of the Securities Exchange Act and that there can be no "recognized market" for a prohibited sale.

### 1. Short–Swing Liability under § 16(b)

LaRoche's claim that the sale of the collateral stock by the Bank was commercially unreasonable depends upon his mistaken assertion that the sale was prohibited under § 16(b) of the Securities Exchange Act of 1934. 15 U.S.C. § 78p(b).

■ There are two flaws in LaRoche's argument. First, LaRoche attempts to support his argument that the Bank's sale was prohibited under § 16(b) by pointing to a case in which the sale of collateral by any party was prohibited, *In re Umbles Drew–Hale Pharmacy, Inc.,* 80 B.R. 421 (Bankr. N.D.Ohio 1987). *Umbles* can be distinguished from the case at bar because the sale of control stock is nowhere prohibited by § 16(b). Section 16(b) merely permits the shareholders of any corporation whose stock is bought and sold within six months by an "insider" to bring a private cause of action to reclaim the insider's profit for the corporation. No other party is prohibited from buying and selling these shares, and no affirmative fines or penalties are imposed. *Allis–Chalmers Manufacturing Co. v. Gulf & Western Indus., Inc.,* 527 F.2d 335 (7th Cir.1975), *cert. denied,* 423 U.S. 1078, 96 S.Ct. 865, 47 L.Ed.2d 839.

In *Umbles*, the collateral which the secured party sold was the inventory of a defaulting pharmacy. The secured party's sale of the inventory was stalled by health regulations which required the permission of a state regulatory board prior to any sale. The pharmacy's counterclaim alleged that since the delay decreased the final sale price to one-third of its original value, the sale was commercially unreasonable. The *Umbles* court rejected the pharmacy's argument because it would penalize the secured party for its compliance with the regulatory procedures which caused the delay.

Contrary to LaRoche's characterization, *Umbles* merely stands for the proposition that where compliance with regulations delays a sale, the secured party is not liable for a resulting decline in value. Clearly, *Umbles* has no bearing on the case at bar since Suffield Bank's sale of the NECO stock collateral was not prohibited by § 16(b).

■ The second flaw in LaRoche's argument is that it would be contrary to the purpose of § 16(b) to permit LaRoche to shift his liability to plaintiff Bank. Congress created § 16(b) to control the securities trading of "corporate insiders," not their secured creditors. As the United States Supreme Court has explained, § 16(b) was enacted to "curb the evils of *insider* trading [by] taking the profits out of a class of transactions in which the possibility of abuse was believed intolerably great." *Reliance Electric Co. v. Emerson Elec. Co.*, 404 U.S. 418, 422, 92 S.Ct. 596, 599, 30 L.Ed.2d 575 (1972) (emphasis added).

■ The drafters of § 16(a) defined an insider, subject to short-swing liability, as "[e]very person who is directly or indirectly the beneficial owner of more than 10 per centum of any class of any equity security ... or who is a director or an officer." 15 U.S.C. § 78p(a). Defendant LaRoche concedes that he met all three definitions since he was, at the time of the pledge, a director, the Chief Executive Officer and an owner of well over 10 per centum of the shares of NECO common stock. Conversely, the plaintiff Bank met none of these definitions of an insider.

■ The policy of § 16(b) requires that the debtor bear all liability for the disposition of the collateral by the secured party. In the leading case on this issue, *Alloys Unlimited, Inc. v. Gilbert*, 319 F.Supp. 617 (S.D.N.Y.1970), the New York District Court reached the same conclusion.

> We are not here dealing with a transaction where there is no possibility of speculation based upon inside information.... If a sale of pledged collateral were to be excluded from the prohibition of § 16(b), an insider after a sharp increase in the market price of shares recently purchased by him, could, upon receiving inside information likely to depress the market price of his stock, pledge it for a loan and, when the market price declined, simply default in his obligation to put up more collateral and allow the lender to sell the collateral to satisfy the loan.... We must, therefore, conclude that the bank's sale of the shares owned by defendant and held in his name constitutes a "sale" [by the debtor] within the meaning of § 16(b).

*Id.*, at 619–620. The Proposed Securities Regulations of the American Law Institute support this position. According to commentary by Thomas L. Hazen: "the Proposed Code would codify the *Alloys Unlimited* approach in every such case by attributing the pledgee's [secured party's] sale or purchase to the pledgor [debtor]." *The New Pragmatism Under § 16(b) of the Securities Act*, 54 N.C.L.Rev. 1, 38 (1975). If § 16(b) liability were not attributed to the debtor, he would need only default on his obligation and compel the secured party to sell the collateral stock at foreclosure to avoid the intended penalties of the Act.

Responsibility for the sale of the collateral must remain with the debtor not only because this will ensure that he cannot evade § 16(b) by forcing the secured party to sell the collateral stock as his proxy, but also because it is the debtor who retains the greatest degree of control over the collateral. In the instant case, for exam-

ple, LaRoche could have bargained for restrictions on the sale of collateral stock when he negotiated the pledge agreement. He could also have prevented the Bank's sale of the NECO stock if he had made payments on the note. Instead he defaulted on the note while at the same time purchasing additional shares of the stock.

■ Finally, as the debtor is the beneficiary of any short-swing profits after the sale of the collateral, to require anyone but him to disgorge those profits would be inequitable. Short-swing profits are the amount by which the sale price of the collateral stock exceeds its purchase price if both purchase and sale take place within a six month period. Once a secured party sells collateral stock it must apply the entire sale price, including the value which exceeds the original purchase price, toward reducing the debtor's obligation to the secured party. R.I.Gen.Laws § 6A-9-504(1). If the short-swing profits portion of the sale price were later set off against the debtor's liability to the secured party, the debtor would receive the benefit of that portion of the sale price twice.

Consequently, to require the Bank to bear the short-swing profits liability would be unfair and contrary to the purposes of § 16(b) of the Securities Exchange Act of 1934. More importantly, nothing in § 16(b) prohibited the Bank's sale of the collateral stock. Therefore, the collateral was sold on a recognized market and this ensured that it was a commercially reasonable sale under Article Nine of the Uniform Commercial Code.

## 2. Secondary Injuries

■ Even if the Bank had not shielded itself from liability by selling the stock on a recognized market, LaRoche's counterclaim would fail because the U.C.C. provides no relief for the secondary injuries which he allegedly sustained. Article Nine Section 507(1) provides the debtor with the remedy of set-off only where the secured party

fails to employ commercially reasonable procedures in conducting the disposition of collateral. R.I.Gen.Laws § 6A-9-507(1). Those procedures define the degree of effort which the secured party is required to make to obtain the fair market value of the collateral. *See United States v. H & S Realty*, 647 F.Supp. 1415 (D.Me.1986), *aff'd*, 837 F.2d 1 (1st Cir.1987).

■ The concept of commercial reasonableness ensures that the court must determine whether the secured party sold the debtor's collateral at the fair market price not by reference to the price itself, but by examination of the secured party's practices leading up to the sale. The District Court for the Southern District of New York has stated: "[T]he primary focus of commercial reasonableness is not the *proceeds* received from the sale but rather the *procedures* employed for the sale." *In re Zsa Zsa Ltd.*, 352 F.Supp. 665, 671 (S.D.N.Y.1972) (emphasis in original), *aff'd without opinion*, 475 F.2d 1393 (2d Cir.1973).[3]

■ LaRoche does not contest that the procedures employed by the Bank realized the fair market value of the collateral. Instead LaRoche requests relief for his short-swing profit liability which is clearly an aftereffect of the sale. LaRoche's alleged injuries are secondary injuries for which he is entitled to no relief under Article Nine.

■ In *Fort Knox National Bank v. Gustafson*, the Kentucky Court of Appeals held that, where a bank properly repossesses the collateral, it incurs no liability for disruption of the debtor's business. A secondary injury, such as disruption of a debtor's business due to sale of collateral, was held to be a "result which Gustafson [the debtor] impliedly consented to in the security agreement." 385 S.W.2d 196, 202 (Ky.1964). Similarly where the secured party's sale of collateral complies with the procedures required by Section 9–504(3) the secured party is not liable for the mental anguish which the sale causes the debtor. *Umbaugh Pole Building Co. v. Scott*, 58

---

**3.** Moreover, the Rhode Island Supreme Court has held that a secured party is required only to observe the procedures specified by the U.C.C. and is not required to respect the debtor's in-

structions for conducting the sale. *Rhode Island Hospital Trust National Bank v. National Health Found.*, 119 R.I. 823, 827, 384 A.2d 301, 304 (1978).

Ohio St.2d 282, 390 N.E.2d 320, 324 (1979).[4] In essence, the secondary injuries for which LaRoche attempts to recover are beyond the limited recourse which Article Nine grants the debtor.

 Furthermore, by requesting set-off based on his injuries consequent to the Bank's sale of the NECO stock, LaRoche is asking this Court to grant him consequential damages, that is "[s]uch damage, loss or injury as does not flow directly and immediately from the act of the party, but only from some of the consequences or results of such acts." *BLACK'S LAW DICTIONARY* 352 (5th ed.1979) *citing Richmond Redevelopment v. Laburnum Const. Corp.*, 195 Va. 827, 80 S.E.2d 574, 580 (1954). The Rhode Island Supreme Court has made clear its position that: "[W]e must follow the Code's directive in Article One that: 'neither *consequential* or special nor penal damages may be had except as specifically provided in Title 6A or by any other rule of law'." *Associates Capital Services Corp. v. Riccardi*, 122 R.I. 434, 438, 408 A.2d 930, 933 (1979) (emphasis added).

Even if the Bank's sale of the NECO stock had been commercially unreasonable, LaRoche would be permitted to recover only the difference between the fair market price and the sale price which the Bank received. R.I.Gen.Laws § 6A–9–507(1). Consequential damages clearly are not provided as a remedy for the commercially unreasonable sale of collateral. *Id.* Therefore, LaRoche seeks relief which is simply not available to him under the U.C.C.

3. Good Faith

 Defendant LaRoche also contends that the U.C.C. requirement that all parties act in good faith and deal fairly, R.I.Gen.Laws § 6A–1–203, "means that sometimes a Bank must refrain from immediate exercise of its rights if it will create unnecessary obligations or consequences for others" and that the Bank's refusal to sell the collateral stock by the method he requested demonstrates the Bank's bad faith. Defendant's Trial Memorandum, page 5.

The Rhode Island Supreme Court has reaffirmed that "there is an implied covenant of good faith and fair dealing between parties to a contract." *Ide Farm & Stable, Inc. v. Cardi*, 110 R.I. 735, 739, 297 A.2d 643, 645 (1972). Additionally, Article Nine states that in the specific context of a disposition of collateral, "[t]he principal limitation on the secured party is the requirement that he proceed in good faith and in a commercially reasonable manner." § 6A–9–507 Official Comment, 1.

While the Rhode Island Supreme Court has not gone further in defining the standard of good faith required of a secured party when selling collateral, courts elsewhere have generated three different standards. Some courts have found the requirement redundant, holding that:

> [I]n the context of a sale of collateral after default, the duty to act in good faith is covered by the requirement that the sale be made in a commercially reasonable manner. There is no additional requirement that the secured party have a specific mental attitude.

*Lamb Brothers, Inc. v. First State Bank*, 285 Or. 39, 52, 589 P.2d 1094, 1101 (1979). According to this standard, if the secured party follows the procedures of a commercially reasonable sale, as the Bank did in the case at bar, the debtor has no basis to claim that the secured party acted in bad faith.

Other courts have considered the behavior of the secured party toward the debtor in order to ascertain the secured party's good faith. Under this objective standard, it does not constitute bad faith for a bank to reject a debtor's post-default request for restrictions on the sale of collateral when those requests exceed the restrictions in

---

**4.** The concept of secondary injuries to a debtor resulting from the disposition of collateral has also been discussed in commentary under the rubric of "causation." *See generally* R. Anderson, *Uniform Commercial Code* § 9–507:11 (3d ed. 1985) ("[W]hen the creditor has initially acted in a proper manner, he will not be held liable for unforeseen consequences of his action.")

the loan agreement. *See Layne v. Fort Carson Nat. Bank*, 655 P.2d 856 (Colo. App.1982). Nor is the fact that the secured party's action caused economic hardship to the debtor sufficient to show a lack of good faith. *See Flagship National Bank v. Gray Distrib. Sys., Inc.*, 485 So.2d 1336 (Fla.App.1986).

In the instant case, the Bank chose to liquidate the NECO stock expeditiously because that stock was the only pledged collateral retaining any value three months after default. Therefore, when analyzed under an objective standard, neither the Bank's refusal to sell the NECO stock according to the schedule LaRoche requested nor LaRoche's resulting secondary injuries indicate that the Bank acted in bad faith.

The most stringent good faith standard is the subjective requirement of "honesty in fact" set forth in §§ 1–201(19) § 1–203. *See, e.g., United States v. H & S Realty Co.*, 647 F.Supp. at 1415. Even under this standard, however, LaRoche cannot show that the Bank lacked good faith as he has not alleged that the Bank was in any way dishonest. The Bank demonstrated its good faith by giving LaRoche notice of its plans to sell the NECO stock, though this was not strictly required by the U.C.C. *See* R.I.Gen.Laws § 6A–9–507(2). In sum, the Bank's sale of the collateral met all of the existing standards of good faith required for such sales under the U.C.C.

### III. CONCLUSION

LaRoche's counterclaim stumbles on each step of its journey. Suffield Bank's sales of the NECO stock were conducted on a "recognized market." Thus, under the Rhode Island U.C.C., the sales were commercially reasonable. The Bank's proper sales of collateral are not rendered commercially unreasonable because they caused an indirect injury to LaRoche. Nor do these secondary injuries indicate any lack of good faith on the Bank's part. Furthermore, the transfer of short swing profit liability from LaRoche, the "insider," to the Bank would contradict the central purpose of the Short–Swing Profits Act.

To settle previous debts to the Bank, LaRoche negotiated the pledge and granted the Bank the right to dispose of the collateral upon his default. He then defaulted on the loan. For the Court to allow him now to evade the statutory consequences of these actions would be contrary to the law as well as public policy.

### IV. ORDER

The Bank requests an order compelling defendant LaRoche to deliver the 4680 shares of NECO created by the NECO stock split. However, the doctrine of election of remedies provides that pursuit of one remedy excludes pursuit of other inconsistent remedies. *Silva v. Silva*, 122 R.I. 178, 404 A.2d 829 (1979); *City of Pawtucket v. Pawtucket Lodge No. 4*, 545 A.2d 499, 502 (R.I.1988).

The Bank elected to pursue its money judgment remedy when it filed its motion for partial summary judgment. It would be inconsistent for the Court to give the Bank a judgment now by which it may collect the full amount of LaRoche's debt and, at the same time, also grant the Bank permission to acquire and sell collateral. The time to resort to collateral to reduce the debt has long since passed. In short, by pursuing this remedy for money damages the Bank has waived its right to the 4680 split shares in LaRoche's possession. Thus, the Bank's request for an order transferring those shares is denied.

On May 9, 1990, this Court granted plaintiff Bank's motion for "partial" summary judgment on the issue of defendant LaRoche's liability for default on the note. The amount of the judgment is now ascertained. The judgment will consist of $448,137.33, the amount which the parties have stipulated as the original principal amount of the loan reduced by the net proceeds of the Bank's sales of NECO stock collateral; plus $3,490.42 in late charges; plus interest. The interest equalled $59,840.73 as of August 8, 1990, the date of the filing of the agreed statement of facts. A per diem interest charge of $149.38, as provided by the note, continues to accrue from August 9, 1990, until the date the judgment is

**64**

entered. The pledge agreement also requires LaRoche to pay the Bank's attorneys' fees of $20,052.00, and collection expenses of $1,137.82. Those amounts are reasonable. Therefore, the clerk will enter judgment forthwith for the plaintiff on the complaint in the total amount set forth above, $532,658.30, plus the per diem interest charges accrued from August 9, 1990.

Defendant LaRoche's counterclaim, which seeks to reduce this liability to the Bank by set-off of his alleged short-swing profits liability to NECO, is without merit. The clerk will also enter judgment forthwith for the plaintiff on defendant's counterclaim.

*It is so ordered.*