[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
DECISION
The matter before the Court is an application for preliminary injunction filed by the defendants seeking to enjoin and restrain the plaintiff, The Washington Trust Company, from foreclosing upon the domicile of the guarantors, defendants, Gerald N. Butterworth and Linda G. Butterworth (the Butterworths).
This matter was originally brought by The Washington Trust Company to compel the defendants to return a certain aircraft, the Cloud Dancer, to Rhode Island. The aircraft was security for a promissory note executed on April 8, 1992 by R.I. Aircraft Company for $65,000.00. Security for the note consisted of a security agreement in the aircraft, Cloud Dancer, a Grumman Model GA-7, Serial No. GA7-0030. In addition, the Butterworths executed a personal guaranty and pledged the equity in their home as security for their obligation under the guaranty.
Gerald N. Butterworth is the chief operating officer and along with Linda G. Butterworth, his wife, is the sole shareholder of the debtor, R.I. Aircraft Company. It is undisputed that R.I. Aircraft Company defaulted on the loan in April, 1993 although Mr. Butterworth maintained he was attempting to work out the loan before the plaintiff filed this action and ultimately took possession of the aircraft.
The complaint was filed on May 21, 1993 seeking in part, pre-judgment seizure or repossession of the aircraft. A temporary restraining order was issued compelling the defendants to produce the aircraft. Service of the order was made and on June 1, 1993 the plaintiff sought a contempt order against defendants for their failure to produce the aircraft. Although the aircraft was produced prior to the contempt hearing, an evidentiary hearing was held on the issue of Butterworth's contempt. Gerald N. Butterworth appeared pro se at the contempt hearing and participated in the taking of evidence. No person appeared on behalf of or represented any other defendant. A transcript of this hearing has been made a part of this record.
What is apparent from the transcript is the aircraft was seized by The Washington Trust Company on June 4, 1993. Mr. James Grundy, a licensed mechanic and pilot, was engaged by Washington Trust to remove the aircraft from the Richmond Airport. The stated intention of the plaintiff was to remove the aircraft to Nashua, New Hampshire to be sold by Mr. Grundy. On June 4, 1993 Mr. Grundy testified and described himself as a pilot mechanic with 15 years experience who intended to fly the aircraft to Nashua, New Hampshire and sell it.
The trial justice found Mr. Butterworth in contempt for violating his May 21, 1993 restraining order but ruled he had sufficiently purged himself of that contempt by producing the aircraft, its log books and keys. He also ruled as follows:
 "I want to make sure before we leave here this morning that we have a complete understanding as to what's to be done, so that I don't want to see you people before me any more on this case. Mr. Longolucco has only one purpose, he wants to get this plane over to Nashua so it can be sold and the proceeds can be applied to your loan, and indirectly you may benefit by this if you can get a good price on the sale."
The sale envisioned by the Court as described by the plaintiff never occurred. The parties have very different views of what actually did occur.
What is clear is the aircraft was never advertised for sale and no public sale ever occurred. Mr. James Grundy flew the aircraft to New Hampshire, conducted an inspection, reported his results to the plaintiff and subsequently purchased the aircraft for $12,000.00 at a so-called "private sale". Whether or not the debtors received notice of the sale is an issue before the Court.
Plaintiff obtained a default judgment in the action on the note and book account on November 23, 1993. Defendants are asking the Court to vacate the default judgment, to find that the aircraft was not disposed of in a commercially reasonable manner in violation of the Uniform Commercial Code Gen. Laws 1956 (1990 Reenactment) § 6A-9-507, and restrain the foreclosure sale of the real estate pledged as part of the Butterworths' guaranty. Defendants further urge the Court to determine the fair market value of the aircraft at the time of its seizure on June 4, 1993 and direct The Washington Trust Company to account to the defendants for any surplus over the balance of their loan and to deny the plaintiff an award of attorneys fees.
THE DEFAULT JUDGMENT
It is undisputed that a default judgment against all defendants was entered by the Clerk on November 16, 1993. Defendants seek relief from that judgment pursuant to Rule 60 of the Rules of Civil Procedure, specifically they allege the default should be set aside because of misconduct of the plaintiff pursuant to Rule 60(b)(3) and for other reasons justifying such relief pursuant to Rule 55.
Defendants allege that if Washington Trust had disposed of the collateral in a commercially reasonable manner then there would be no need for a deficiency judgment. They maintain the value of the collateral at the time of its seizure was far in excess of the amount owed on the note and but for this misconduct of Washington Trust, the debt would have been satisfied.
Defendants further allege that Gerald N. Butterworth appearedpro se before Mr. Justice Ragosta on June 4, 1993, yet his appearance pro se was not entered in the case file and he was not given notice of the subsequent entry of default and the request for judgment pursuant to Rule 55(b)(2).
Finally, defendants allege they were not given notice of the so-called private sale of the collateral in violation of §6A-9-504(c)(3) and were thus deprived of any opportunity to repurchase the collateral or secure a greater sales price than realized by Washington Trust.
The Court is mindful that a default judgment may not lightly be set aside. Rule 55(c) requires that parties seeking removal of a default bear a heavy burden of establishing good cause sufficient to warrant the removal of the default. Likewise, Rule 60 permits the Court to vacate a judgment for inter alia, the misconduct of a party or for any other reason justifying relief from the judgment.
The Court is satisfied that this is such a case and that the judgment should be set aside and the default vacated. Based on the Court's findings regarding the conduct of The Washington Trust Company in the disposition of the collateral, (seeinfra), relief from the judgment is necessary to avoid an injustice to the guarantors, Mr. and Mrs. Butterworth, and the debtor, R.I. Aircraft Company.
When the aircraft was seized on June 4, 1993 and Gerald Butterworth appeared pro se to defend against a contempt motion, he had a right to expect the collateral would be disposed of in a commercially reasonable manner by The Washington Trust. He had every expectation that the plaintiff, with whom he had had a long-standing banking relationship would act in good faith, would give him notice of the private sale of his property and would serve him with notice of the application for judgment pursuant to the Uniform Commercial Code and the Rules of Civil Procedure. None of this happened. The lack of notice to the Butterworths throughout the entire travel of this case is troubling and basically unfair. Mr. Butterworth appeared pro se
on June 4, 1993 and participated in the hearing on his own behalf. He was entitled to notice of the application for judgment pursuant to Rule 55(b)(2). Further, he was certainly entitled to notice of the private sale of his aircraft and received no such notice (see infra).
Finally, the underlying purposes and policies of the Uniform Commercial Code are to simplify and clarify the law governing commercial transactions and to promote good faith, diligence, reasonableness and care between the parties. The totality of the circumstances in this case lead the Court to conclude that these policies were not adhered to by the plaintiff. To allow this judgment to stand would result in a manifest injustice to the defendants.
THE COMMERCIAL REASONABLENESS OF THE DISPOSITION OF THECOLLATERAL
This matter is governed by Gen. Laws 1956 (1990 Reenactment) § 6A-9-504, the Rhode Island counterpart to the Uniform Commercial Code. The relevant portions of the Statute provides as follows:
 § 6A-9-504 (1) A secured party after default may sell, lease or otherwise dispose of any or all of the collateral in its then condition or following any commercially reasonable preparation or processing. * * *
 (2) If the security interest secures an indebtedness, the secured party must account to the debtor for any surplus, and, unless otherwise agreed, the debtor is liable for any deficiency. * * *
 (3) Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable.
Thus in clear and unequivocal language § 504 of Chapter 9 sets forth the rights and responsibilities of a secured party in the disposition of the debtor's property after default. It reflects the tone of reasonableness and fairness sounded throughout the Code and it vests the debtor with certain protections and places on the secured party an affirmative duty to dispose of the collateral in a commercially reasonable manner. This duty extends to both private and public sales and mandates the debtor receive notice of the disposition of his property.
The Code recognizes the debtor's liability to the secured party for any deficiency of any indebtedness as well as the secured party's duty to account for any surplus. However, the secured party's right to any deficiency is inextricably linked to its obligations with respect to the disposition of the collateral. Associates Capital Services Corp. v. Riccardi,122 R.I. 434; 408 A.2d 930 (1979).
Where the secured creditor fails to make a commercially reasonable disposition of the collateral, a presumption arises that the fair market value of the collateral at the time of the resale equals the amount of the outstanding debt. While not precluding the recovery of a deficiency judgment, AssociatesCapital Services makes it clear that the secured party assumes the burden of overcoming the presumption and must prove that the fair market value of the collateral was less than the outstanding debt. The Court must consider evidence of the reasonable amount the collateral would have sold for at a proper sale. The secured party must obtain a fair and reasonable appraisal at or near the time of repossession or produce convincing evidence of the value of the collateral by a showing of the condition of the collateral and the usual price of items of like condition. AssociatesCapital Services Corp. v. Riccardi, supra.
An examination of the disposition of Cloud Dancer in light of the foregoing leads the Court to conclude that no aspect of this sale was commercially reasonable.
An appraisal of the aircraft was performed in April 1992 in support of the loan application. The value of the collateral ranged from $66,710 to $76,716 with a 15% markup for retail. According to Gerald Butterworth, nothing happened to the aircraft between April 1992 and June 1993 to affect its value. The aircraft underwent an annual inspection in 1991 and 1992 and was due for its 1993 annual inspection in June, 1993. All inspections were conducted by Michael Dupont of King Aviation in Taunton, Massachusetts.
Mr. Butterworth testified he is a dealer for Grumman Aircraft, was familiar with the purchase and sale of similar aircraft and in his opinion the average retail value of the aircraft was approximately $70,000 in June 1993. He acknowledged that the engines had high use time but denied that the aircraft had any serious defects or mechanical problems. He maintained the aircraft was in an airworthy condition on the date of its seizure by The Washington Trust Company.
Mr. Butterworth testified that he had placed advertisements for the sale of the aircraft in recognized publications. The listed price was $87,000.00 "as is" or $106,000.00 with new engines. He repeatedly stated he had received offers to sell the aircraft prior to and subsequent to its seizure by Washington Trust. He testified he received an offer of $82,500 from Mr. R.J. Wheelan on April 15, 1993. A copy of this offer was introduced into evidence. Butterworth stated he refused this offer but would have accepted it if he had known the plane would be seized and sold. All inquires he received after the seizure were referred to The Washington Trust Company.
Mr. Butterworth stated he received no notice about his collateral subsequent to the time he appeared in court for the contempt hearing. He testified he was quite interested in what would become of his aircraft and carefully followed the trade publications looking for any advertisements for its sale.
Butterworth testified he had over 22 years in the business of repairing and selling aircraft and has been a licensed dealer since 1976. He insisted the aircraft was worth at least $63,000.00 wholesale and he could produce several dealers who would agree.
Finally, Mr. Butterworth admitted he did not have a lawyer at the time of the default of his loan and was unaware of any deficiency. He testified he thought the debt was satisfied and was unaware of any deficiency until he received a latter from plaintiff's attorney in February, 1994.
Donald A. Dinneen, the owner of King Aviation and Aerospace, testified as an expert witness in the sale of aircraft. He is an experienced dealer and presently owns 34 to 36 aircraft; he buys and sells approximately 50 aircraft a year. He testified his company performs both appraisals of aircraft and pre-purchase inspections.
Mr. Dinneen testified he is familiar with the aircraft in question; that his company serviced the aircraft and conducted its inspections; he stated he knows the aircraft well. Mr. Dinneen testified that in determining the price or market value of an aircraft all dealers use a guide similar to the blue book for automobiles which is published quarterly. This guide contains the average price of an aircraft. According to Mr. Dinneen the market for used aircraft is skyrocketing because these planes are not being produced today. He described the Cloud Dancer as a beautiful airplane that was well maintained. He said the only thing wrong was the aircraft had high use time on its engines. In his opinion the plane was worth $62,000 to $69,000 brand new but with the added equipment this aircraft carried it was worth "in the mid to low 80's". He also testified that this value would increase by $25,000.00 if new engines and propellers were installed.
He testified that in his experience when a bank forecloses upon an aircraft the bank solicits legitimate bids from reputable dealers and accepts the highest bid. In most cases these commercial loans are handled by only 3 or 4 banks with a large and experienced staff. He stated he has never heard of Mr. Grundy or Quonset Airlines or Quonset Aviational Services, the companies Mr. Grundy represented.
Michael Dupont, the Director of Maintenance at King Aviation testified that he holds an Inspection Authorization from the Federal Aviation Administration and is an airplane and power plant inspector and a private pilot. He testified he conducts over 100 annual inspections a year and is an expert in the area of aircraft maintenance. He is familiar with Cloud Dancer and had performed two previous annual inspections of the aircraft. He knew that at the time of its seizure the plane had been flying without any problems and was in an airworthy condition.
Mr. Jeffrey B. McKernan, a Special Assets Officer for The Washington Trust Company testified that his responsibility with the institution is to work on criticized assets and delinquent loans and try to work them out; that he handled the consumer loan once it became delinquent and he referred the loan to counsel for collection. He admitted that Washington Trust Company employed no agents experienced in the repossession of aircraft and had no written procedures for dealing with such collateral. Mr. McKernan retained Mr. Grundy from a previous conversation in which Mr. Grundy contacted him to solicit aircraft repossession business. Mr. McKernan required Mr. Grundy to demonstrate he was insured but apparently made no further investigation of Mr. Grundy's background and experience in the disposition of aircraft seized as collateral. Washington Trust had no written contract with Mr. Grundy nor was he required to produce any references attesting to his experience not as a licensed pilot but as the aircraft dealer he eventually became. Mr. McKernan testified Washington Trust simply retained Mr. Grundy to remove the aircraft to his hanger and conduct an inspection. Washington Trust considered no other alternatives and Mr. McKernan never saw the plane again after June 4, 1993.
Mr. Grundy submitted a report of inspection of the aircraft dated July 7, 1993. The report consists of a cover letter in which Mr. Grundy states a retail price of the aircraft in good condition ranging from $53,100 to $62,000 and a wholesale price of $49,500. However, he states the aircraft is in such poor condition its value is greatly reduced. He submits a list of needed repairs and the estimate of the cost of these repairs and deducts these costs from the wholesale price for a net value of $7,100.00. Shortly thereafter Mr. Grundy submits another letter offering to buy the aircraft for $12,000.00.
On October 1, 1993, Jeffrey McKernan on behalf of The Washington Trust Company issued a bill of sale of the aircraft to Quonset Airlines, Inc. for $12,000.00.
The repair list submitted by Mr. Grundy totaled $46,000 of which $27,670 was for the repair and overhaul of the engines and propellers. Mr. McKernan testified he felt he could not justify spending $46,000 of the bank's money for these repairs, yet he sought no other estimates nor did he consult with any other dealers because "I didn't think I had to".
The Court finds the inspection report submitted by Mr. Grundy does not equal a valid appraisal of the aircraft. Both of defendants' experts, Mr. Dinneen and Mr. Dupont, as well as Mr. Butterworth described this list of repairs as something that would be prepared in the industry for a customer who is in the market for a given aircraft. Such a list would be prepared to appraise the buyer of what ordinary repairs were needed and as a bargaining tool for negotiations. Both agreed that the actual repairs contained in the list are typical in the industry and these repairs would be handled at the annual inspection. Each witness stressed that nothing on the list would affect the airworthiness of the aircraft and are common repairs. Mr. Dupont stated that with the exception of the engines these repairs could be accomplished for "a couple of thousand" dollars.
Mr. McKernan apparently placed great reliance on this list. He testified he presented the report to senior management and notified them of a possible loss and then asked Mr. Grundy if he would be interested in buying the aircraft "as is". He did nothing else with respect to this collateral. He testified he sat on it for some time because he was hoping to receive some other offers. He admitted that calls would come into the bank and he would give the caller Mr. Grundy's name and number. He admitted Washington Trust had no listing agreement with Mr. Grundy and apparently he made no effort to follow up on these inquiries.
This is the only aircraft Washington Trust has ever financed. According to Mr. McKernan the original appraisal of $76,716 was not in his file and he was unaware of its existence. He admitted that he relied upon the fact that the loan was partially secured by the Butterworth home and stated he knew what the value of the home was but not the value of the aircraft. The Court finds he made no reasonable effort to determine the value of this aircraft and simply planned on seeking a deficiency from the guarantors.
Finally, Mr. McKernan was unable to satisfy the Court that the debtor or the guarantors received any notice regarding the disposition of this aircraft. Mr. Butterworth testified he never heard from Washington Trust after the contempt hearing. The Court accepts this testimony. Counsel for Washington Trust was able to produce his own copy of a letter purportedly sent to the Butterworths by Mr. McKernan. Mr. McKernan testified that all his letters are sent by certified mail yet he was unable to produce any receipt or notice of non-delivery. Moreover, Mr. McKernan was unable to produce the bank's own copy of this letter. Therefore, the Court concludes the plaintiff has not met its burden of proving notice was in fact sent. Further, the Court notes the letter produced by counsel is not addressed to the debtor, only the Butterworths, who are the guarantors.
Thus the Court finds that Washington Trust Company has failed to establish that the disposition of the collateral was commercially reasonable in any respect whatsoever. The defendants were not given proper notice of the proposed sale of the aircraft. No valid appraisal of its value was obtained by Washington Trust. The sale of the aircraft was not advertised in any commercial publication; there were no efforts made to encourage meaningful bidders for the collateral and any interested buyers were referred to Mr. Grundy, who ultimately became the only bidder at the sale.
Where a debtor raises the defense of commercial unreasonableness in the sale of collateral after default the Court must examine the secured party's practices leading up to the sale. Suffield Bank v. LaRoche, 752 F. Supp. 54 (D.R.I. 1990). Courts have discretion in evaluating the practices of a secured party but where a sale occurs in a recognized market, that discretion is limited Suffield Bank, supra. This sale did not occur in a recognized market for the disposition of repossessed aircraft. Thus the Court must examine the conduct of the plaintiff in light of § 6A-9-504(c)(3). The secured party bears the burden of establishing by a preponderance of the evidence that every aspect of the sale be commercially reasonable including its method, manner, time, place and terms. AssociatesCapital Services Corp. v. Riccardi, 454 F. Supp. 832 (D.R.I. 1978).
After a careful review of the record the Court concludes the plaintiff has not met this burden of proof. The Court finds that no aspect of this sale was commercially reasonable. The defendants are therefore entitled to the presumption that the actual fair market value of the collateral at the time it was seized was equal to the amount of the outstanding indebtedness. This presumption operates as a defense to a deficiency judgment.
Plaintiff is entitled to present evidence to overcome this presumption and to establish the reasonableness of its fees and expenses, including the storage of the aircraft. This matter is therefore continued for an evidentiary hearing. Defendants shall have ten days to answer the complaint.
Counsel shall agree on an order consistent with this decision.